UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

JOHN EUGENE MEASE,

               Plaintiff,                   Case No. 2:20-cv-176

v.                                  Honorable Janet T. Neff

HEIDI WASHINGTON, et al.,

               Defendants.

_____/

## OPINION

      This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c).  The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Washington, Horton, Yon, Corrigan, Batho, Thompson, and Unknown Party, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court will also dismiss, for failure to state a claim, the following claims against the remaining Defendants:  Plaintiff's conspiracy, due process, Eighth Amendment, free exercise, and RLUIPA claims, as well as his

claims concerning alleged violations of MDOC policy.  Plaintiff's retaliation claims against Defendants Wonnacott, McKinney, Lemmerman, Wech, and Simpson remain in the case.

## Discussion

### I.     Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Central Michigan Correctional Facility (STF) in St. Louis, Gratiot County, Michigan.  The events about which he complains, however, occurred at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan.  Plaintiff sues MDOC Director Heidi Washington and the following URF officials:  Warden Connie Horton; Deputy Warden Unknown Yon; an unknown nurse (Unknown Party); Assistant Deputy Warden James Corrigan; Acting Assistant Deputy Warden R. Batho; Resident Unit Manager Shane Thompson; Prisoner Counselor Ricky J. Wonnacott; and officials Unknown Lemmerman, C. McKinney, Unknown Wech, and Unknown Simpson.[1]

Plaintiff, a member of the Nation of Islam religion, alleges that, on May 20, 2019, he was summoned to return to C-Unit, to be placed in a 6-week quarantine for a scabies outbreak. When he entered the unit, Plaintiff saw prisoners standing in line to be weighed, apparently as part of the scabies protocol.  Plaintiff got in line, but Defendant McKinney immediately instructed Plaintiff to go to his bunk.  When Plaintiff attempted to explain that he had not been weighed, Defendant McKinney told him to go to his bunk or risk being placed in segregation.  Plaintiff complied.

---

[1] Plaintiff initially filed his action in the Eastern District of Michigan.  His complaint named three additional Defendants, all of whom were dismissed from the action by that court before the case was transferred to this Court. (ECF No. 4.)

Later that day, Plaintiff complained about McKinney's conduct to Defendant Wonnacott.  Wonnacott told Plaintiff that McKinney was likely having a bad day, due to the scabies outbreak and the resulting additional work.  Plaintiff asked Defendant Wonnocott if he was aware that Plaintiff, like other Ramadan participants on the unit, would not be able to take medications until the sun set without improperly breaking their fasts.  Defendant Wonnocott advised Plaintiff that it should not be a problem.

On May 22, 2019, Wonnocott convened a meeting of the unit's Ramadan participants and advised that a refusal to take the scabies medication at 1:00 p.m. would result in 96 days' placement in administrative segregation.  Wonnocott asked for questions.  Plaintiff responded that his religion forbade him from taking the medication until after sunset.  Wonnocott told Plaintiff that he had heard enough and exited the meeting.  As a result of Defendant Wonnocott's threat, all other Ramadan participants on the unit took their medication at 1:00 p.m. Plaintiff then spoke with Defendants Thompson, Yon, Corrigan, and the unknown nurse, stating that he was not being allowed to practice his religion.  They stated that he was allowed to practice his religion, but, because he would not take the medication at 1:00 p.m., he would have to be quarantined in administrative segregation, given the medicine at 9:30 p.m., and remain in segregation until Friday, May 24, 2019.  Upon release from segregation on May 24, Plaintiff returned to his bunk.  Plaintiff claims that, because of his placement in segregation, he was denied his religious material, hygiene items, and legal property and was terminated from his high-paying job at Michigan State Industries (MSI) Garment Factory.

On May 29, 2019, Defendants dispensed a second round of scabies medications. Again, because distribution occurred during the daytime and during Ramadan, Plaintiff refused to break his fast to take the medicine.  He again was placed in administrative segregation, given the

medication at a later time, and released from segregation two days later, on May 31, 2019.  When he returned to his bunk, however, another prisoner was there, having been assigned by Defendant Lemmerman.  Lieutenant Biggers (not a defendant) called C-Unit and then instructed Plaintiff to "return to C-Unit and wait in the TV room until Wonnacott finds you a bunk[.]"  (Compl., ECF No. 1, PageID.4.)  Plaintiff complied with Biggers' instruction.  Defendant Lemmerman then began to write Plaintiff a misconduct charge, apparently for being in the TV room.

When Plaintiff saw his name on the misconduct, he went to the Annex to inform staff what was happening.  He spoke with Inspector Miller (not a defendant) about what was happening.  Plaintiff stated that the misconduct charge was just further retaliation and harassment by C-Unit staff for refusing to break his Ramadan fast.  Miller advised Plaintiff that URF administrators would not condone the taking of his religious services or the termination from his prison job.  Inspector Miller had Sergeants Portice and Gurnoe (not defendants) contact Defendant Chaplain Rink and Classification Director D. Pellar (not defendants) to have Plaintiff's religious services and MSI job reinstated.  Miller told Plaintiff that he would normally move Plaintiff to another unit, but, given the outbreak, he would have to wait until the end of quarantine.

Plaintiff returned to C-Unit and attempted to talk to Defendant Wonnacott about the retaliation and religious discrimination being shown by Defendants Wonnacott, Lemmerman, and McKinney.  Wonnacott refused to discuss the issue and refused to place Plaintiff's legal name back on the door card.

Plaintiff filed a grievance on June 1, 2019, describing what he viewed as incidents of harassment by Defendants Wonnacott, Lemmerman, and McKinney.  After the filing of his grievance, Defendants Wonnacott, Lemmerman, and McKinney allegedly increased their harassment and derogatory remarks.  Plaintiff spoke with Defendant Yon while Yon was on

rounds, explaining that he needed his job to pay off his institutional debt and to continue his legal research for his habeas corpus brief.  Defendant Yon instructed Plaintiff to avoid misconducts so that he could be moved at the end of the quarantine.

On June 29, 2019, when Plaintiff saw Defendant McKinney, McKinney made gestures to Plaintiff, implying that Plaintiff was "crying" to Inspector Miller and Defendant Yon. Plaintiff told Defendant McKinney to stop mocking his religion and playing childish games. Plaintiff told Defendant Lemmerman to tell Miller and Yon that they didn't run C-Unit. Defendants McKinney and Lemmerman became upset because Plaintiff had talked back.  At 12:00 p.m., Plaintiff went to the C-Unit officer's desk to ask McKinney to sign his itinerary to go to lunch and the law library.  McKinney refused.  At 12:20 p.m., Plaintiff went to the counselor's office and asked that Defendant McKinney or Defendant Lemmerman sign his itinerary.  Both Defendants refused.  Plaintiff waited until the unit had been called to lunch before reporting the incident to Sgt. Marra (not a defendant) in the chow hall.  Plaintiff submitted two grievances.

On June 30, 2019, Plaintiff received a notice of a Class-II misconduct charge for verbal insolence on June 29, 2019, written by Defendant Lemmerman.  That same date, Plaintiff received a notice from Defendant Simpson that Defendant McKinney had issued Plaintiff a Class-III misconduct charge for excessive noise on June 29, 2019.  Plaintiff complains that, without asking Plaintiff, Defendant Simpson checked the box indicating that Plaintiff did not want to sign. Plaintiff asked Defendant Wech for two grievance forms, and Defendant gave him four, stating, "[M]ake sure you get the name right. . . . We're a team, your ass is out of here."  (*Id.*, PageID.6.) On June 30, 2019, Defendant Simpson charged Plaintiff with a Class-III misconduct for violation of posted rules, because Plaintiff was standing in the TV room.

Defendant Wech found Plaintiff guilty of the excessive-noise misconduct and sanctioned him to five days of toplock, the maximum sanction for a Class-III misconduct. Defendant Simpson issued Plaintiff a misconduct ticket for profanity on July 5, 2019, and Defendant McKinney found Plaintiff guilty of the misconduct for profanity on July 7, 2019. Again, Plaintiff received five days of toplock.  Plaintiff alleges that, prior to these misconducts, he had been free of Class-II and Class-III misconducts for ten months and free of Class-I misconducts for five years.

As reflected in the June 19, 2019, Warden's Forum minutes, prisoner representatives raised issues of alleged abuse by MDOC hearing officers, who were not using progressive sanctioning in misconducts, and by staff members, who were placing post-it notes on the misconducts with recommended sanctions.  Defendant Horton stated that the administration was not aware of the conduct and did not support it.  Horton appointed Defendants Batho and Corrigan to ensure compliance with the rules.  Plaintiff complains that, on all Class-III misconduct appeals, Defendants Batho and Corrigan now state that "[t]he sentence imposed at the hearing is solely at the discretion of the hearings officer and was not subject to review on appeal."  (*Id.*, PageID.6.)

Pennie Clymer, the MSI-Garment Factory Supervisor (not a defendant), completed a prisoner work assignment evaluation for Plaintiff, which indicated that Plaintiff had received 15 days of toplock for a Class-II or -III misconduct charge and could not come back to work at MSI for six months.  Clymer stated, however, that she would hire him back.

On July 1, 2019, Captain Burke convened a Class-II misconduct hearing for the June 29 insolence charge issued by Defendant Lemmerman.  Burke directed Plaintiff to retrieve the copy of the June 29 excessive-noise misconduct written by Defendant McKinney.  Burke then

abruptly postponed the hearing.  On July 13, 2019, Plaintiff received Burke's decision on the misconducts, which ordered Plaintiff to serve five days of toplock.  Plaintiff appealed the finding. Defendant Yon granted the appeal and ordered a rehearing on July 15.  Despite showing Defendants Slater and Dye the appeal, those Defendants told Plaintiff that he had to serve the sanctions, because they were in the system.  Plaintiff kited the warden, and Assistant Resident Unit Supervisor Tolly told Plaintiff that Defendant Hearings Investigator Bridges told Tolly that Plaintiff had to do the sanctions anyway.  Plaintiff submitted a request for a declaratory ruling to Defendant Washington, but he did not receive a response within the 30 days set forth in Mich. Admin. R. 791.1115.

Plaintiff contends that Defendants Wonnacott, Yon, Corrigan, Thompson, and Unknown Party discriminated against him on the basis of his religion, in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1(a), by lying to him that he would face 96 days in segregation if he failed to take the medication during the fasting hours.  In addition, he contends that his placement in segregation and the handling of his misconduct charges violated prison policy and his right to due process. Plaintiff further alleges that Defendants Wonnacott, McKinney, Lemmerman, Wech, and Simpson subjected him to retaliation for the exercise of his First Amendment rights to practice his religion and to seek redress of grievances by falsifying misconduct tickets and imposing excessive sanctions that they knew would result in the loss of his prison job.  Further, Plaintiff alleges that Defendants Wonnacott, McKinney, Lemmerman, Wech, Simpson, Batho, Corrigan, and Horton conspired to discriminate against his religion or acquiesced in that discrimination by abusing the

misconduct process.  Further, Plaintiff alleges that Defendant Washington[2] knowingly acquiesced in the baseless disciplinary punishment of five days of toplock without due process.

Plaintiff seeks declaratory and injunctive relief, together with compensatory and punitive damages.

## II.     Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the

---

[2] Plaintiff also mentioned the three dismissed Defendants in this allegation.

*Twombly*/*Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## III. Conspiracy

Plaintiff alleges that Defendants Wonnacott, McKinney, Lemmerman, Wech, Simpson, Batho, Corrigan, and Horton conspired to discriminate against Plaintiff on the basis of his religion, presumably in violation of 42 U.S.C. §§ 1983 and 1985.[3] A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal

[3] Plaintiff specifically alleges that Defendants conspired in violation of § 1985(3), though the Court has broadly construed his factual allegations to include a conspiracy claim under § 1983, as well. The Court notes, however, that Plaintiff also purports to raise a claim under 18 U.S.C. § 241. Plaintiff, however, has no private right of action under the criminal statute 18 U.S.C. § 241. The statute does not provide an independent cause of action. *See United States v. Oguaju*, 76 F. App'x 579, 581 (6th Cir. 2003) (holding that the district court properly dismissed defendant's claim filed pursuant to 18 U.S.C. §§ 241 and 242 because he had no private right of action under those criminal statutes). Moreover, Plaintiff cannot compel the enforcement of a criminal statute against Defendants. *See Abner v. Gen. Motors*, 103 F. App'x 563, 566 (6th Cir. 2004) (finding that a private citizen cannot initiate a federal criminal prosecution under 18 U.S.C. § 241); *Cok v. Cosentino*, 876 F.2d 1, 2 (1st Cir. 1989) (per curiam) ("Only the United States as prosecutor can bring a complaint under 18 U.S.C. §§ 241–242."). As a private citizen, Plaintiff "'lacks a judicially cognizable interest in the prosecution or nonprosecution of another.'" *Diamond v. Charles*, 476 U.S. 54, 63 (1986) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff.  *Id.*; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).  Similarly, to state a claim for conspiracy under § 1985, a plaintiff must allege facts showing that (1) two or more persons conspired (2) for the purpose of depriving the plaintiff of the equal protection of the laws and (3) that the conspirators committed an overt act (4) that injured the plaintiff.  *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005); *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998) (citing *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994)).  The § 1985 plaintiff also must demonstrate that the conspiracy was motivated by a class-based animus, such as race or another class that receives heightened protection under the Equal Protection Clause.  *See Bartell v. Lohiser*, 215 F.3d 550, 560 (6th Cir. 2000) ("[Section] 1985(3) only covers conspiracies against:  1) classes who receive heightened protection under the Equal Protection Clause; and 2) 'those individuals who join together as a class for the purpose of asserting certain fundamental rights'") (quoting *Browder v. Tipton*, 630 F.2d 1149, 1150 (6th Cir. 1980)); *Radvansky*, 395 F.3d at 314; *Johnson*, 40 F.3d at 839; *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996).

Under both § 1983 and § 1985, a plaintiff must plead with particularity, as vague and conclusory allegations unsupported by material facts are insufficient to state a claim. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987); *Smith v. Rose*, 760 F.2d 102, 106 (6th Cir. 1985).  Vague and conclusory allegations of conspiracy unsupported by material facts are

insufficient to state a claim.  *See Gutierrez*, 826 F.2d at 1538 (citing *Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir. 1984)).

Aside from one comment by Defendant Wech, unaccompanied by any negative conduct, Plaintiff's allegation that Defendants conspired is entirely conclusory and speculative. Even viewed in the light most favorable to Plaintiff, the complaint describes a number of discrete facts that occurred over a period of time involving several individual officers, coupled with conclusory allegations about the responsibility of supervisory personnel for that conduct. Plaintiff has provided no allegations establishing a link between the alleged conspirators or any agreement between them. He relies entirely on an attenuated inference from the mere fact that he has been disciplined by or subjected to somewhat objectionable treatment by a number of prison officials in various circumstances with which he disagrees. As the Supreme Court has held, such allegations, while hinting at a "possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Instead, the Court has recognized that although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state a claim where that conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior." *Iqbal*, 556 U.S. at 680. Plaintiff's conclusory allegations fall short of stating a conspiracy claim under either § 1983 or § 1985.

Moreover, Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. The intracorporate conspiracy doctrine states that "if all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy." *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Ed.*, 926 F.2d 505, 510 (6th Cir. 1991). The Sixth Circuit repeatedly has applied the doctrine to claims under 42 U.S.C. § 1985(3). *Johnson v.*

*Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839–40 (6th Cir. 1994) (quoting *Hull*, 926 F.2d at 510).

In *Jackson v. City of Cleveland*, 925 F.3d 793, 817–19 (6th Cir. 2019), the Sixth Circuit concluded

that the intracorporate conspiracy doctrine applies to § 1983, as well as § 1985.  As a result, unless

members of the same collective entity (such as the MDOC) are acting outside the scope of their

employment, they are deemed to be one collective entity and not capable of conspiring.  *Jackson*,

925 F.3d at 819; *see also Novak v. City of Parma*, 932 F.3d 421, 436–37 (6th Cir. 2019) (same).

Here, all Defendants are members of the same collective entity (the MDOC) who

work at the same divisional location.  Plaintiff does not allege, much less show, that Defendants

were acting outside the scope of their employment.  The "scope of employment" limitation

"recognizes a distinction between collaborative acts done in pursuit of an employer's business and

private acts done by persons who happen to work at the same place."  *Johnson*, 40 F.3d at 840.

"The mere 'fact that two or more agents participated in the decision or in the act itself will normally

not' suffice to create a conspiracy."  *Id.* (quoting *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th

Cir. 1972)).  In addition, "simply joining corporate officers as defendants in their individual

capacities is not enough to make them persons separate from the corporation in legal

contemplation."  *Harris v. Bd. of Educ.*, 798 F. Supp. 1331, 1346 (S.D. Ohio 1992).  Instead, a

plaintiff must allege that the defendants "acted other than in the normal course of their corporate

duties."  *Id.*

Plaintiff alleges no facts suggesting that Defendants were acting outside the normal

course of their duties, however improperly he believes they may have been exercising those duties.

Plaintiff therefore does not establish the exception to the intracorporate conspiracy doctrine for

actions taken outside the scope of employment.  As a consequence, Plaintiff's conspiracy claim

under § 1983 also is barred under the intracorporate conspiracy doctrine.

For both reasons, Plaintiff fails to state a conspiracy claim.

## IV.    Supervisory liability—§ 1983

Beyond his vague allegations of conspiracy, Plaintiff fails to allege that Defendants Washington, Horton, Yon, Corrigan, Batho, or Thompson took any action against him.  He merely suggests that Defendants failed to adequately supervise their subordinates or respond to Plaintiff's grievances concerning the alleged religious discrimination and policy violations.

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability.  *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).   A claimed constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).   "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.

The Sixth Circuit repeatedly has summarized the minimum required to constitute active conduct by a supervisory official:

> "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it."  *Shehee,* 199 F.3d at 300 (emphasis added) (internal quotation marks omitted).  We have interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300, and citing *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) (citing *Rizzo v. Goode*, 423 U.S. 362, 375–76 (1976), and *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).

Plaintiff fails to allege any facts showing that Defendants Washington, Horton, Yon, Corrigan, Batho, or Thompson encouraged or condoned the conduct of their subordinates, or authorized, approved or knowingly acquiesced in that conduct.  He alleges only that they had responsibility to prevent Defendants Wonnacott, Lemmerman, McKinney, and Wech from discriminating against him, issuing false misconducts against him, or imposing sanctions on him that he believed were too high, either by supervising Defendants better or responding differently to Plaintiff's grievances and complaints.  Plaintiff's vague and conclusory allegations of supervisory responsibility are insufficient to demonstrate that Defendants were personally involved in the events surrounding Plaintiff's reclassification to administrative segregation.  Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983.  *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555.  Because Plaintiff's § 1983 action against Defendants Washington, Horton, Yon, Corrigan, Batho, or Thompson is premised on nothing more than respondeat superior liability, his action fails to state a § 1983 claim against them.

## V.     Failure to follow prison policy

Plaintiff alleges that various Defendants violated prison policies.  He specifically alleges the following:  his placement in segregation violated prison policy; hearing officers did not use progressive sanctions as required by policy; Defendant McKinney violated policy by imposing an improper misconduct sanction; the authors of misconduct tickets improperly made sentencing

recommendations; officials did not follow the scabies protocol, failing to weigh Plaintiff before the distribution of the scabies medicine; Defendants McKinney and Lemmerman refused to sign Plaintiff's itinerary, in violation of policy; and Defendants McKinney and Lemmerman improperly processed Plaintiff's misconduct charge, violating the policy allowing Plaintiff a hearing.

To the extent Plaintiff invokes prison policy, he fails to state a claim.  Claims under § 1983 can only be brought for "deprivations of rights secured by the Constitution and laws of the United States."  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982).  Section 1983 does not provide redress for a violation of a state law.  *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994); *see also Laney v. Farley*, 501 F.3d 577, 580–81 & n.2 (6th Cir. 2007).

Moreover, to the extent the Plaintiff intends to allege that he has a due process interest in prison policy, his claim also fails.  To demonstrate a violation of procedural due process, a plaintiff must prove the following elements:  (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process.  *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).  "Without a protected liberty or property interest, there can be no federal procedural due process claim."  *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)).

Courts routinely have recognized that a prisoner does not enjoy any federally protected liberty or property interest in state procedure.  *See Olim v. Wakinekona*, 461 U.S. 238, 250 (1983); *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *Brody v. City of Mason*, 250 F.3d 432, 437 (6th Cir. 2001); *Sweeton*, 27 F.3d at 1164; *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992).  Plaintiff's allegations

15

that multiple Defendants violated prison policy therefore fail to raise a cognizable federal due process claim.

## VI.    Denial of due process in misconduct proceedings

Plaintiff also appears to argue that Defendants McKinney, Lemmerman, Simpson, and Wech denied him due process by charging or finding him guilty of misconduct charges for verbal insolence, excessive noise, and failure to follow posted rules.  Insolence is a Class-II misconduct, and the other two offenses are Class-III misconduct charges.  *See* MDOC Policy Directive 03.03.105, Attach. B, C (effective July 1, 2018).

The Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner.  *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause.  According to that Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin*, 515 U.S. at 486–87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995).

Under Michigan Department of Corrections Policy Directive 03.03.105 ¶ B (eff. July 1, 2018), a Class-I misconduct is a "major" misconduct and Class-II and -III misconducts are "minor" misconducts.  The policy further provides that prisoners are deprived of good time, disciplinary credits, or disciplinary time only when they are found guilty of a Class I misconduct. *See* Policy Directive 03.03.105, ¶ AAAA.  The Sixth Circuit routinely has held that misconduct convictions that do not result in the loss of good time are not atypical and significant deprivations and therefore do not implicate due process.  *See, e.g., Ingram v. Jewell*, 94 F. App'x 271, 273 (6th

16

Cir. 2004), *overruled on other grounds by Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003); *Green v. Waldren*, No. 99-1561, 2000 WL 876765, at *2 (6th Cir. June 23, 2000); *Staffney v. Allen*, No. 98-1880, 1999 WL 617967, at *2 (6th Cir. Aug. 12, 1999).  Plaintiff, therefore, fails to state a due process claim arising from his Class-II and Class-III misconduct convictions for insolence, excessive noise, and failure to follow posted rules.

Moreover, to the extent that Plaintiff complains about his brief placements in segregation, he fails to state a due process claim.  Confinement in administrative segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration."  *Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (superseded by statute on other grounds).  Thus, it is considered atypical and significant only in "extreme circumstances."  *Joseph v. Curtin,* 410 F. App'x 865, 868 (6th Cir. 2010).  Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship."  *Harden-Bey v. Rutter*, 524 F.3d 789, 794 (6th. Cir. 2008).

The *Sandin* Court concluded that mere placement in administrative segregation for 30 days did not implicate a liberty interest because the segregation at issue in that case did not impose an atypical and significant hardship.  *Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005).  Plaintiff utterly fails to suggest that his two two-day placements in segregation imposed an atypical and significant hardship.

The same is true for Plaintiff's loss of prison employment and other consequences of his confinement in segregation.  If Plaintiff's confinement in segregation does not implicate a protected liberty interest, it follows that the loss of privileges stemming from that confinement do not implicate such an interest.  Furthermore, federal courts consistently have found that prisoners

17

have no constitutionally protected liberty interest in prison vocational, rehabilitation, and educational programs under the Fourteenth Amendment. *See, e.g., Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (Due Process Clause not implicated by prisoner classification and eligibility for rehabilitative programs, even where inmate suffers "grievous loss"); *Argue v. Hofmeyer*, 80 F. App'x 427, 429 (6th Cir. 2003) (prisoners have no constitutional right to rehabilitation, education or jobs); *Canterino v. Wilson*, 869 F.2d 948, 952–54 (6th Cir. 1989) (no constitutional right to rehabilitation); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no constitutional right to prison employment); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (participation in a rehabilitative program is a privilege that the Due Process Clause does not guarantee); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (no constitutional right to rehabilitative services). Moreover, because the Constitution and federal law do not create a property right for inmates in a job, "they likewise do not create a property right to wages for work performed by inmates." *Carter*, 69 F. App'x at 680 (citing *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991), and *James v. Quinlan*, 866 F.2d 627, 629–30 (3d Cir. 1989)). Consequently, Plaintiff's loss of privileges and loss of his prison job and associated wages did not trigger a right to due process.

## VII.   Religious discrimination

Plaintiff contends that Defendants Wonnacott and Unknown Party discriminated against him on the basis of his religion, in violation of the First Amendment. He contends that Defendant Wonnacott lied to Ramadan observants, including Plaintiff, by stating that they would face 96 days in segregation if they failed to take the medication during the fasting hours. Plaintiff

alleges that Defendant Unknown Party[4] is liable for the discrimination, because she acquiesced in the discriminatory treatment.   Plaintiff also alleges that Defendants Wonnacott, McKinney, Lemmerman, Wech, Simpson, Batho, Corrigan, Horton, and Unknown Party are liable under RLUIPA for discrimination against Plaintiff's religion.

### A.     First Amendment

The Free Exercise Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]."   U.S. Const. amend. I; *see also Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (holding that the Fourteenth Amendment incorporates the First Amendment's protections against states).   While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion.   *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted).   To establish that this right has been violated, Plaintiff must establish the following:   (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) Defendant's behavior infringes upon this practice or belief.   *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, No. 95-2348,1997 WL 428903, at *2 (6th Cir. July 30, 1997) (noting that "sincerely held religious beliefs require accommodation by prison officials").

Even outside the prison context, the Supreme Court long has recognized "that the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct

---

[4] Plaintiff also alleged that Defendants Washington, Horton, Yon, Corrigan, Batho, and Thompson, as supervisory officials, were responsible for Wonnacott's religious discrimination and other alleged constitutional violations.   As discussed, however, Plaintiff's claims rested on a theory of respondeat superior, which is not actionable under § 1983.

that his religion prescribes (or proscribes).'" *Emp't Div., Dep't of Hum. Resources of Oregon v. Smith*, 494 U.S. 872 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263, n.3 (1982) (Stevens, J., concurring in judgment)); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).  Plaintiff's own allegations demonstrate that the rule in question—that all prisoners on the unit had to take the medication at 1:00 p.m.—was of general applicability. Moreover, Plaintiff does not even suggest that the motivation for the timing of the distribution lacked neutrality.  Clearly, the requirement was neutral on its face.  And Plaintiff alleges no facts suggesting that the timing of the medication distribution was motivated by a non-neutral reasons. *See Church of the Lukumi Bablu Aye*, 508 U.S. at 534.  As a consequence, the fact that the distribution caused an impact on Plaintiff's ability to freely exercise his religion does not immunize Plaintiff from compliance with the rule or accepting the consequence of noncompliance.

Moreover, in the prison context, even if the requirement could be found to interfere with Plaintiff's free-exercise rights, a proposition the Court rejects, officials may impinge on inmate's constitutional rights where their actions are "reasonably related to legitimate penological interests."  *See Flagner*, 241 F.3d at 483 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess the official's actions by reference to the following factors:

1.    does there exist a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

2.    are there alternative means of exercising the right that remain open to prison inmates;

3.    the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and

4.    whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89–91).

Failure to satisfy the first factor renders the regulation or action infirm, without regard to the remaining three factors. *Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89–90) ("a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational").  If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the policy or action at issue is reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484 (citations omitted).  The *Turner* standard is "not a 'least restrictive alternative' test" requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."  Instead, the issue is simply whether the policy or action at issue is reasonably related to a legitimate penological interest. *Id.*

Defendants unquestionably had a legitimate penological interest in managing a scabies outbreak in the unit.  The dosing of all unit residents simultaneously and keeping them in quarantine for the same period of time—an action that applied to prisoners regardless of their religious affiliation—undoubtedly bore a close relationship to Defendants' legitimate interest in controlling the outbreak of infection at the prison.  The first prong of the *Turner* test therefore is met.

Second, despite having to choose between briefly breaking his Ramadan fast and accepting placement in administrative segregation for two days, Plaintiff had ample opportunity for Plaintiff to practice his religion and pursue his fast.  Indeed, Plaintiff elected to continue his

21

fast, to take the medication at 9:30 p.m., and to remain in segregation for 48 hours.[5]  Plaintiff was able on all other dates than the two on which he received doses of medication to observe all other tenets of his religion.

Third, the accommodation of various prisoners' interests in taking the medication at alternative times unquestionably would have caused difficulty in tracking the dosing of all prisoners on the unit and would have required extra workload for prison administrators. Defendants undoubtedly planned the mass administration of medication during the daytime hours because those were the hours of highest staffing in health care.  Requiring the distribution of medication to large numbers of unit members during the evening hours would have imposed a substantial burden on prison administration.  Indeed, Plaintiff attaches a non-exhaustive list of 19 prisoners in the unit who were participating in the Ramadan fast, all of whom would have had to be accommodated before sunrise or after sunset.  (ECF No. 1, PageID.16.)  For these reasons, accommodation for Plaintiff (and other Ramadan observants) unquestionably would have had a non-incidental effect on prison operations.

Fourth, for the same reason, there were no ready alternatives that would have alleviated the conflict between medication dosing and Ramadan fasting.  Plaintiff has identified no ready alternative that would have accommodated both the prison's interest in ensuring all inmates on the unit were treated promptly and efficiently to control an outbreak and the burden it imposed on Ramadan observants.

---

[5] Plaintiff alleges that Defendant Wonnacott threatened to place anyone who refused the drug at 1:00 p.m. in administrative segregation for 96 days.  Plaintiff contends that the threat therefore violated the First Amendment by inducing all other Muslim prisoners on the unit to take the medication at 1:00 p.m.  Plaintiff, however, did not break his fast, and he was never subjected to 96 days of administrative segregation.  He therefore did not suffer an injury from the threat, and the Court has concluded that the actual choice he faced did not violate the First Amendment. Moreover, to the extent that Plaintiff seeks to assert that others were injured by the threat, his claim must be denied. Plaintiff lacks standing to assert the constitutional rights of other prisoners.  *Newsom*, 888 F.2d at 381; *Raines v. Goedde*, No. 92-3120, 1992 WL 188120, at *2 (6th Cir. Aug. 6, 1992).

As a consequence, under the *Turner* analysis as well, Plaintiff fails to state a First Amendment claim against Defendant Wonnacott.   Because Plaintiff has alleged no First Amendment violation, Defendant Unknown Party may not be held liable for failing to intervene in Defendant Wonnacott's decision to require all inmates to take the medication at 1:00 p.m.   The Court therefore will dismiss Plaintiff's First Amendment claims against Defendants Wonnacott Unknown Party.

**B.     RLUIPA**

The Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1(a), provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to [a prison] . . . unless the government demonstrates that imposition of the burden on that person:  (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.*; *see also Haight v. Thompson*, 763 F.3d 554, 559–60 (6th Cir. 2014).

RLUIPA applies to prisons that receive federal funds and prohibits state and local governments from placing "a substantial burden" on the "religious exercise" of any inmate unless they establish that the burden furthers a "compelling governmental interest" and does so in the "least restrictive" way. 42 U.S.C. § 2000cc–1(a).  While the phrase "substantial burden" is not defined in RLUIPA, courts have concluded that a burden is substantial where it forces an individual to choose between the tenets of his religion and foregoing governmental benefits or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 733–34 (6th Cir. 2007) (citations omitted); *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise).  Similarly, if a policy requires a petitioner to "engage in conduct that seriously

violates [his] religious beliefs" or face disciplinary action, then the burden is substantial.  *Holt v. Hobbs*, 574 U.S. 352, 356 (2015).  Moreover, the fact that the petitioner is able to engage in other forms of religious exercise is not relevant to whether the burden is substantial.  *Id.*

The Sixth Circuit, like the Supreme Court, has recognized that "RLUIPA 'provide[s] very broad protection for religious liberty.'"  *Fox v. Washington*, 949 F.3d 270, 276–77 (6th Cir. 2020) (quoting *Holt*, 574 U.S. at 356 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014))).  In the prison context, RLUIPA provides greater protections than the First Amendment.  *See Fox*, 549 F.3d at 277; *Colvin v. Caruso*, 605 F.3d 282, 296 (6th Cir. 2010) (citing *Lovelace v. Lee*, 472 F.3d 174, 199–200 (4th Cir. 2006)).

To establish a cognizable claim under RLUIPA, the inmate must first demonstrate that a prison policy substantially burdens a religious practice.  So long as the practice is traceable to a sincerely held religious belief, *see Cutter*, 544 U.S. at 725 n.13, it does not matter whether the inmates' preferred exercise is "central" to his faith, 42 U.S.C. § 2000cc–5(7)(A).  Once an inmate makes this showing, the prison policy survives only if it serves a compelling governmental interest in the least restrictive way.  *Id.* § 2000cc–1(a); *see also Haight*, 763 F.3d at 559–60.

RLUIPA defines "the term "government" to include the following:

**(i)** a State, county, municipality, or other governmental entity created under the authority of a State;

**(ii)** any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and

**(iii)** any other person acting under color of State law[.]

42 U.S.C. § 2000cc-5(4)(a).  Thus, by its terms, the statute includes state officials within the definition of "government."

Although the statute permits the recovery of "appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), the Supreme Court has held that monetary damages are

not available against states under RLUIPA.  *Sossamon v. Texas (Sossamon II)*, 563 U.S. 277 (2011).  In *Sossamon*, the Court held that the RLUIPA did not abrogate sovereign immunity under the Eleventh Amendment.  *See also Cardinal v. Metrish*, 564 F.3d 794, 801 (6th Cir. 2009) ("[T]he Eleventh Amendment bars plaintiff's claim for monetary relief under RLUIPA.").  A suit against an individual in his official capacity is equivalent to a suit brought against the governmental entity.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).  Therefore, to the extent that Plaintiff seeks damages from Defendants in their official capacities, he is not entitled to relief under RLUIPA.

The Eleventh Amendment presents no bar to suit in federal court where equitable relief is sought against State officials who continue to violate federal law.  *Cory v. White*, 457 U.S. 85, 90 (1982); *Pennhurst State School & Hospital*, 465 U.S. at 103.  However, in the present action, the allegations made by Plaintiff concern two related but isolated incidents rather than a continuing violation of federal law.  Past exposure to illegal conduct is not, by itself, sufficient proof that the plaintiff will be subject to the illegal conduct again or present a "case or controversy," if unaccompanied by any continuing, present adverse effects.  *See, e.g., Los Angeles v. Lyons*, 461 U.S. 95 (1983); *Alvarez v. City of Chicago*, 649 F. Supp. 43 (N.D. Ill. 1986); *Bruscino v. Carlson*, 654 F. Supp. 609 (S.D. Ill. 1987), *aff'd*, 854 F.2d 162 (7th Cir. 1988).  *See also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).  A claim for injunctive relief lies only where when a "'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).  A court should assume that, absent an official policy or practice urging unconstitutional behavior, individual government officials will act constitutionally.  *Lyons*, 461 U.S. at 102; *O'Shea*, 414 U.S. at 495–96.

In the present action, Plaintiff has neither alleged the existence of an official policy or practice nor alleged facts that suggest the alleged activity is likely to recur. Instead, he alleges only two discrete incidents and makes no allegation about a continuing violation of his rights. Under these circumstances, the possibility that Plaintiff will be subjected to the same allegedly unconstitutional activity is too speculative to warrant prospective injunctive relief or to deem the alleged activity a continuing violation of federal law. Accordingly, the Plaintiff's demands for injunctive relief do not prevent dismissal of his action.

Similarly, where there is no claimed continuing violation of federal law, no occasion to issue an injunction, and a declaratory judgment would serve no useful purpose, declaratory relief is inappropriate. *Green v. Mansour*, 474 U.S. 64, 73 (1985). Declaratory relief, like injunctive relief, is prospective only. *See Small v. Brock*, 963 F.3d 539, 543 n.2 (6th Cir. 2020) (citing *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019) (holding that, in the absence of a real and immediate threat that the action will occur in the future, a plaintiff is not entitled to declaratory relief)). Because Plaintiff raises no continuing violation of federal law, no basis exists for granting either injunctive or declaratory relief. Plaintiff's RLUIPA claims against Defendants in their official capacities, therefore, must be dismissed.

Although RLUIPA's definition of "government" includes governmental officials, *see* 42 U.S.C. § 2000bb-2(1), the Sixth Circuit squarely held in *Haight*, 763 F.3d 554, that RLUIPA's "appropriate relief" language does not permit money damages against state prison officials when the lawsuit targets the defendants in their individual capacities. *Id.* at 569. All other circuits to address the issue have agreed with that result. *See Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014); *Nelson v. Miller*, 570 F.3d 868, 88689 (7th Cir. 2009); *Washington v. Gonyea*, 731

F.3d 143, 145–46 (2d Cir. 2013); *Stewart v. Beach*, 701 F.3d 1322, 1334–35 (10th Cir. 2012); *Sharp v. Johnson*, 669 F.3d 144, 153 (3d Cir. 2012); *Rendelman v. Rouse*, 569 F.3d 182, 186–89 (4th Cir. 2009); *Sossamon v. Texas (Sossamon I)*, 560 F.3d 316, 327–38 (5th Cir. 2009), *overruled in other part by Sossaman II*, 563 U.S. 277; *Smith v. Allen*, 502 U.S. 1255, 1272 (11th Cir. 2007), *abrogated in other part by Sossaman II*, 563 U.S. 277.

More recently, however, in *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020), a case involving the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb-1(c), 2000bb-2(1), the Supreme Court arguably cast doubt on *Haight*'s conclusion that the identical language of "appropriate relief" used in RLUIPA does not encompass damages from individual-capacity defendants.  Considering identical language under RFRA, the *Tanzin* Court concluded that RFRA permits individual-capacity lawsuits against government officials.  141 S. Ct. at 490.  The Court further held that "appropriate relief" under RFRA includes damages.  *Id.* at 492.

Nevertheless, while the language of "appropriate relief" is common to both RFRA and RLUIPA, the *Tanzin* Court reiterated what it had said in *Sossamon II*, 563 U.S. at 286, that "what relief is '"appropriate" is 'inherently context dependent.'"  *Tanzin*, 141 S. Ct. at 491.  The *Tanzin* Court noted one distinction in context from *Sossamon II*—that it was considering an action filed "against individuals, who do not enjoy sovereign immunity[,]" *id.* at 493, rather than a damages action against a state.

Since *Tanzin*, the Western District of Kentucky has concluded, without analysis, that, notwithstanding *Haight*—which is controlling authority for that as well as this district—under the analysis of *Tanzin*, RLUIPA authorizes damages claims against officials acting in their individual capacities.  *Ruplinger v. Louisville/Jefferson Cnty. Metro Gov't*, No. 3:19-cv-583, 2021 WL 682075, at *4 (W.D. Ky. Feb. 22, 2021).  In contrast, the Western District of Wisconsin has

noted that, "[a]lthough both statutes contain the same operative provisions about seeking 'appropriate relief' against the government, government officials and 'other person[s] acting under color of law,' 42 U.S.C.A. §§ 2000bb-1 and -2 and 2000cc-2 and -5, the Court did not discuss whether its holding also applied to RLUIPA . . . ." *Johnson v. Goff*, No. 19-cv-543, 2021 WL 39639, at *7 (W.D. Wis. Jan. 15, 2021). The *Johnson* court's observation is noteworthy, given that the Supreme Court distinguished its decision from *Sossamon II* and otherwise distinguished RLUIPA from RFRA.

In addition, this Court observes that there exists a more substantial contextual difference between RLUIPA and RFRA: RFRA was adopted under Section 5 of the Fourteenth Amendment, while RLUIPA was adopted under the Spending and Commerce Clauses. The distinction affects the interpretation of "appropriate damages" under the two statutes.

The Supreme Court long has recognized that the scope of Congress' authority to legislate to enforce the Fourteenth Amendment is broad, permitting Congress to abrogate state sovereign immunity without the consent of the states, *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 35–36 (2012), and "both to remedy and to deter violation of rights guaranteed" by the Fourteenth Amendment, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000), including against individuals, *see, e.g., Hafer v Melo*, 502 U.S. 21, 28 (1991) (holding that 42 U.S.C. § 1983 provides for individual liability, recognizing congressional intent to permit liability against "persons," and the broad authority of Congress in enacting statutes under the Fourteenth Amendment). The Supreme Court repeatedly has recognized that congressional authority under section 5 is principally limited by the scope of the protections of the Fourteenth Amendment, which Congress itself does not have the authority to determine. *Id.*; *see also Nevada Dep't of Hum. Res.*, 538 U.S. 721, 728 (2003) (recognizing that congressional action was principally constrained by the scope

of Fourteenth Amendment protections); *City of Boerne v. Flores*, 521 U.S. 507, 508 (1997) (distinguishing between legitimate congressional authority to enforce the Free Exercise Cause from the authority to alter the governing law controlling the "substance of the Amendment's restrictions on the States"). And, in *Tanzin*, the Court found that the availability of individual liability for violations of the First Amendment under § 1983—another statute authorized under section 5 of the Fourteenth Amendment—was "particularly salient in light of RFRA's origins." *Tanzin*, 141 S. Ct. at 492.

In contrast, Congress enacted RLUIPA under the Spending and Commerce Clauses.[6] In *Haight*, the Sixth Circuit rested its conclusion that Congress did not authorize individual-capacity damages claims under RLUIPA on the absence of the necessary clarity in the words "appropriate relief." The court rejected the defendants' argument that, because the imposition of individual damages does not implicate a state's sovereign immunity, *Sossamon II*'s requirement of a clear statement was inapplicable. The *Haight* court held that defendants had "understate[d] the coverage of the clear-statement rule," and that "[c]larity is demanded *whenever* Congress legislates through the spending power, whether related to waivers of sovereign immunity or not. *Id.* at 568 (emphasis in original) (citing *South Dakota v. Dole,* 483 U.S. 203, 206–07 (1987), and *Pennhurst*, 451 U.S. at 17). As the *Haight* court recognized, because the Spending Clause permits Congress "to exceed its otherwise limited and enumerated powers by regulating in areas that the vertical structural protections of the Constitution would not otherwise permit[,]" *id.*

---

[6] In adopting the RLUIPA, Congress invoked its authority under both the Spending Clause and the Commerce Clause. *See* 42 U.S.C. § 2000cc-1(b)(1)-(2). Every circuit to consider the constitutionality of RLUIPA has concluded that the statute on its face is constitutional under Congress' authority under the Spending Clause. *See Sossaman I*, 506 F.3d at 328–29 & n.34; *Smith*, 502 F.3d at 1274 n. 9 (valid only under Spending Clause, not Commerce Clause); *Madison v. Virginia*, 474 F.3d 118, 124 (4th Cir. 2006) (approving of enactment under the Spending Clause, but not passing on whether the statute was constitutional under the Commerce Clause); *Cutter v. Wilkinson*, 423 F.3d 579, 584–90 (6th Cir. 2005) (same); *Benning v. Georgia*, 391 F.3d 1299, 1313 (11th Cir. 2004) (same); *Charles v. Verhagen*, 348 F.3d 601, 606–11 (7th Cir.2003) (same); *Mayweathers v. Newland*, 314 F.3d 1062, 1066–70 (9th Cir. 2002) (same); *see also Cutter*, 544 U.S. at 715 (stating that Congress enacted RLUIPA under the Spending and Commerce Clauses).

(citing *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012)), "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation,'" *id.* at 569 (quoting *Dole,* 483 U.S. at 207) (quoting *Pennhurst,* 451 U.S. at 17)).

Addressing Congress' alternative enactment power, the *Haight* court observed that Congress' invocation of a second constitutional authority for a statute ordinarily has no effect on how a statute should be interpreted:

> [W]hen Congress invokes more than one source of federal power to enact a law, it does so as a form of insurance—on the off chance that the first source of authority exceeds its grasp.  It does not invoke two sources of authority in order to permit two interpretations of the same phrase.  Otherwise, the general presumption that language in a statute means the same thing in all settings would be an exception, not a rule.  *See Clark v. Martinez*, 543 U.S. 371, 380 . . . (2005).  Where possible, and it is eminently possible here, courts avoid treating statutes like chameleons that turn green in some settings but not others.

*Haight*, 763 F.3d at 569 (additional citations omitted).  Nevertheless, reaching the merits of the issue, the *Haight* court held that the federal statutes enacted under the Commerce Clause, like those enacted under the Spending Clause, require a clear statement of Congress' intent:  "'If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so *unmistakably clear* in the language of the statute.'"  *Id.* (emphasis added in *Haight*) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).  Applying the clear-statement rule, the *Haight* court found insufficient clarity in RLUIPA's phrase "appropriate relief" to impose individual liability for damages on government officials.  *Haight*, 763 F.3d at 570.

In finding that RLUIPA does not permit individual-capacity damages claims, the *Haight* court stopped short of accepting the reasoning of the majority of other courts that have concluded that RLUIPA does not provide for damages against a person in his individual capacity. While some courts have agreed with the Sixth Circuit about the need for clarity under the Spending

and Commerce Clauses, *see Rendelman*, 569 F.3d at 189; *Sharp*, 669 F.3d at 154 (alternative

ground), all others have concluded that statutes based on the Spending Clause, such as RLUIPA,

should not generally be interpreted to impose liability on individuals who do not themselves

receive federal funds.  *See, e.g., Wood*, 753 F.3d at 903; *Nelson,* 570 F.3d at 886–88; *Smith,* 502

F.3d at 1273–75.  In *Sossamon I*, the Fifth Circuit explained why an interpretation that imposes

individual liability on a state's citizens solely because the state accepts federal funds creates

significant federal-state tension:

> [I]f a congressional enactment could provide the basis for an individual's liability
> based only on the agreement of (but not corresponding enactment of legislation by)
> a state, then important representation interests protected by federalism would be
> undermined.  After passively acquiescing in the regulation of its citizens under a
> federal standard to receive needed funding from Congress, a state legislature could
> point its finger at the federal government for tying needed funds to an undesired
> liability—the regulation or law responsible for such liability not having been
> enacted by the state.  Congress could reciprocate by pointing its finger at the state
> legislature for accepting the funds and visiting liability on its citizens by the state's
> own choice, even though the state itself did not enact the law or regulation in
> question.  Such an approach blurs the lines of decisional responsibility; that, in turn,
> undermines the popular check on both state and federal legislatures.

560 F.3d at 329 (footnotes omitted) (relying on *Smith*, 502 F.3d at 1273–75).  *See also Wood*, 753

F.3d at 904 (holding that "[t]he statute does not authorize suits against a person in anything other

than an official or governmental capacity, for it is only in that capacity that the funds are

received"); *Washington*, 731 F.3d at 145–46 (concluding that enactment pursuant to the spending

power "allows the imposition of conditions, such as individual liability, only on those parties

actually receiving the state funds") (citing *Smith*, 502 F.3d at 1272–75) (same)); *Stewart*, 701 F.3d

at 1334–35 (joining other circuits in concluding that "'Spending Clause legislation is not

legislation in its operation; instead, it operates like a contract, and individual RLUIPA defendants

are not parties to the contract in their individual capacities'") (quoting *Sossamon I*, 560 F.3d at

328); *Sharp*, 669 F.3d at 153–55 (holding that statutes under Spending Clause generally cannot

subject government officials to individual liability, as they are not recipients of the funds and that RLUIPA's "appropriate relief" language was far too vague to signal such an intent); *Nelson*, 570 F.3d at 888–89 (approving analysis in *Smith*, 502 F.3d at 1273–75, and concluding that, to avoid deciding the "serious question[]" of whether Congress had exceeded its authority under the Spending Clause, it would "decline to read RLUIPA as allowing damages against defendants in their individual capacities"); *Sharp*, 669 F.3d at 154 (holding that, when enacting legislation under the Spending Clause, Congress may only "'subject the grant *recipient* to liability'") (quoting *Smith*, 502 F.3d at 1274); *c.f. Kuperman v. Wrenn*, 645 F.3d 69, 79 (1st Cir. 2011) (indicating approval of the *Smith* analysis without deciding the question).  The Sixth Circuit, however, concluded that the decisional basis utilized by these courts proved too much, as it would "mean that even an eminently clear statute—say, that 'plaintiffs could obtain money damages in actions against state and local prison officials, whether sued in their official or individual capacity'—would not permit money damages." *Haight*, 763 F.3d at 570.

Regardless of whether *Haight*'s analysis is more persuasive than the analysis of the other courts, *Haight*'s determination that RLUIPA does not authorize damages against state officials in their individual capacity was not expressly overruled by *Tanzin*.  Moreover, the basis of the *Haight* court's decision—the need for clarity in statutes promulgated under the Spending and Commerce Clauses—did not apply in *Tanzin*.  As a consequence, *Tanzin* did not abrogate *Haight*, which remains controlling authority in this circuit.  Plaintiff therefore is not entitled to damages against Defendants in their individual capacities for the alleged violations of RLUIPA.

### C.     Conclusion:  dismissal of religious discrimination claims

The Court has concluded that Plaintiff fails to state a claim against Defendants Wonnacott, McKinney, Lemmerman, Wech, Simpson, Batho, Corrigan, Horton, and Unknown Party for violation of his First Amendment right to freely exercise his religion.  In addition,

Plaintiff fails to demonstrate that he is entitled to relief under RLUIPA, because RLUIPA does not provide for damages against officials in either their official or personal capacities and because he is not entitled to declaratory or injunctive relief on the facts of the case.  As a consequence, Plaintiff's free-exercise and RLUIPA claims against Defendants Wonnacott, McKinney, Lemmerman, Wech, Simpson, Batho, Corrigan, Horton, and Unknown Party will be dismissed with prejudice for failure to state a claim.

## VIII.   Retaliation

Defendants Wonnacott, McKinney, Lemmerman, Wech, and Simpson subjected him to retaliation for the exercise of his First Amendment rights to practice his religion and to seek redress of grievances by falsifying misconduct tickets and imposing excessive sanctions that they knew would result in the loss of his prison job.

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.*  Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Upon initial review, the Court concludes that Plaintiff has alleged facts sufficient to state a claim against Defendants Wonnacott, McKinney, Lemmerman, Wech, and Simpson. Plaintiff's retaliation claims therefore remain in the case.

IX.     **Pending motion**

Plaintiff has filed a motion (ECF No. 13) seeking reconsideration of the Eastern

District of Michigan's September 15, 2020, decision (ECF No. 4), which dismissed Defendants

Bridges, Slater, and Dye and transferred the remainder of the case to this Court.  The Court will

deny the motion.

Under Rule 54(b) of the Federal Rules of Civil Procedure, a non-final order is

subject to reconsideration at any time before entry of a final judgment.  *Id.*; *see also ACLU v.

McCreary Cnty.*, 607 F.3d 439, 450 (6th Cir. 2010).  Western District of Michigan Local Civil

Rule 7.4(a) provides that "motions for reconsideration which merely present the same issues ruled

upon by the court shall not be granted."  Further, reconsideration is appropriate only when the

movant "demonstrate[s] a palpable defect by which the court and the parties have been misled . . .

[and] that a different disposition of the case must result from a correction thereof."  *Id.*

Plaintiff's motion contains no argument as to why he is entitled to reconsideration.

He alleges no error—much less palpable error—in the decision of the Eastern District to dismiss

the only three Defendants who resided in that district and to transfer venue to this Court, where all

the remaining Defendants reside and where the events in issue occurred.  As a result, venue is

proper in this Court and the interests of justice are served by continuing venue in this district.  *See*

28 U.S.C. §§ 1391(b), 1404(a).  Because Plaintiff has wholly failed to meet his burden of

demonstrating palpable error under W.D. Mich. LCivR 7.4(a), his motion seeking reconsideration

(ECF No. 13), will be denied.

## <u>Conclusion</u>

Having conducted the review required by the Prison Litigation Reform Act, the

Court determines that Defendants Washington, Horton, Yon, Corrigan, Batho, Thompson, and

Unknown Party will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and

1915A(b), and 42 U.S.C. § 1997e(c).  The Court will also dismiss, for failure to state a claim, the following claims against the remaining Defendants:  Plaintiff's conspiracy, due process, Eighth Amendment, free exercise, and RLUIPA claims, as well as his claims alleging violations of MDOC policy.  Plaintiff's retaliation claims against Defendants Wonnacott, McKinney, Lemmerman, Wech, and Simpson remain in the case.  Plaintiff's motion for reconsideration (ECF No. 13) will be denied.

        An order consistent with this opinion will be entered.


Dated:   __May 13, 2021_____               /s/ Janet T. Neff_____
                                                    Janet T. Neff
                                                    United States District Judge