UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOHN EUGENE MEASE, #213302,                      Case No. 2:20-cv-176

       Plaintiff,                                        Hon. Janet T. Neff
                                              U.S. District Judge

   v.

RICKY J. WONNACOTT, et al.,

       Defendants.
_____/

## **REPORT AND RECOMMENDATION**

### I.    **Introduction**

This Report and Recommendation (R. & R.) addresses Defendants' motion for summary judgment.  (ECF No. 74.)  For the reasons set forth below, the undersigned recommends that the Court grant Defendants' motion in part and deny it in part.

Plaintiff — state prisoner John Eugene Mease — filed suit pursuant to 42 U.S.C. § 1983 on July 23, 2020, in the Eastern District of Michigan.  On September 15, 2020, the Eastern District transferred the case to this Court.  (ECF No. 4.)

In his verified complaint, Mease asserted that while he was incarcerated at Chippewa Correctional Facility (URF) in Kincheloe, Michigan, and Macomb Correctional Facility (MRF) in Lenox, Michigan, various employees[1] within the

---

[1]     Including: (1) MDOC  Director Heidi Washington, (2) Warden Connie Horton (URF), (3) Deputy Warden Unknown Yon (URF), (4) Unknown Nurse (URF), (5) Assistant Deputy Warden James Corrigan (URF), (6) Assistant Deputy Warden R. Batho (URF), (7) Resident Unit Manager (RUM) Shane Thompson (URF), (8) Prison Counselor (PC) J. Wonnacott (URF), (9) Corrections Officer (CO) Unknown

Michigan Department of Corrections (MDOC) violated his First, Eighth, and Fourteenth Amendment rights as well as the Religious Land Use and Institutionalized Persons Act (RLUIPA).  (ECF No. 1, PageID.8-9.)  Specifically, Mease said that after he refused to break his Ramadan fast to take medication during a scabies outbreak and later filed grievances alleging retaliation, MDOC employees at URF and MRF harassed, retaliated, and conspired against him for months.  (*Id.*, PageID.3-7.)

Six retaliation claims remain at this stage of the case:

- Mease's claim that Defendants McKinney, Wonnacott, and Lemmerman retaliated against him on May 24, 2019, by depriving Mease of his personal property, terminating his employment, and denying him access to religious services (Claim One);

- Mease's claim that Lemmerman retaliated against him on May 31, 2019, by issuing him a false misconduct ticket (Claim Two);

- Mease's claim that Lemmerman and McKinney retaliated against him by refusing to sign off on his June 29, 2019, itinerary (Claim Three);

- Mease's claim that McKinney retaliated against him by issuing a false misconduct ticket on June 30, 2019 (Claim Four);

---

Lemmerman (URF), (10) CO C. McKinney (URF), (11) CO Unknown Wech, (12) Unknown Simpson (URF), (13) Hearing Investigator Unknown Bridges (MRF), (14) Sergeant Unknown Slater (MRF), and (16) Corrections Officer (CO) Unknown Dye (MRF).

- Mease's claim that Defendant Wech retaliated against him on July 5, 2019, by giving Mease the "maximum sanctions" for the misconduct issued by McKinney (Claim Five); and

- Mease's claim that McKinney retaliated against him on July 7, 2019, by giving Mease the "maximum sanctions" for a misconduct issued by another officer (Claim Six).  (*See* ECF No. 39, PageID.271 (R. & R.); ECF No. 44 (Order Adopting).)

Defendants now move for summary judgment.  (ECF No. 74.)  Defendants generally argue that Mease was not engaged in protected conduct when he refused to break his fast in order to take his scabies medication, and that he was isolated and separated from his property only in an effort to treat the scabies infestation.  (ECF No. 75, PageID.435-438.)  Defendants further aver that Lemmerman did not issue Mease a misconduct ticket on May 31, 2019, and that Mease was not required to obtain authorization from Lemmerman or McKinney before utilizing his June 29, 2019, itinerary.  (*Id.*, PageID.440-441.)  And with respect to the remaining claims, Defendants aver that their actions were motivated by Mease's misconduct and the evidence thereof, not his protected conduct.  (*Id.*, PageID.442-444.)  Defendants also contend that they are entitled to sovereign and qualified immunity as to all of Mease's claims.

In response, Mease argues that even if his refusal to break his fast did not constitute protected conduct, he made several oral grievances to prison staff, including complaints about McKinney's derogatory conduct.  (ECF No. 90-1,

PageID.540.)  He further avers that his property was taken from him for nine days, and that when he returned from isolation during the scabies outbreak, other prisoners had their personal property.  (*Id.*, PageID.538.)  Mease goes on to say that that Lemmerman's threat to file a misconduct was a sufficiently adverse action, even though the misconduct was never submitted.  (*Id.*, PageID.543.)  And Mease claims that URF's posted rules required staff to sign off on itineraries before prisoners could move about the facility.  (*Id.*, PageID.544-545.)  Finally, Mease argues that there are at least genuine issues of fact bearing on whether the remaining adverse actions were motivated by his protected conduct.  (*Id.*, PageID.545-546.)

The undersigned respectfully recommends that the Court rule that Defendants are entitled to sovereign immunity in their official capacities with respect to Mease's claims for monetary damages, but that Defendants are not entitled to qualified immunity in their personal capacities.   For the reasons set forth below, the undersigned further recommends that the Court grant Defendants' motion for summary judgment with respect to the following:

- Mease's Claim One as it pertains to Defendants Lemmerman and McKinney, and as it pertains to Mease's allegations that Defendant Wonnacott retaliated by confiscating Mease's property and terminating his employment; and

- Mease's Claim Two.

And the undersigned respectfully recommends that the Court deny Defendants' motion for summary judgment with respect to the following:

- Mease's Claim One as it pertains to Mease's allegation that Defendant Wonnacott retaliated by depriving Mease of his religious services;

- Mease's Claim Three;

- Mease's Claim Four;

- Mease's Claim Five; and

- Mease's Claim Six.

## II.    Relevant Factual Allegations

According to his verified complaint, Mease is a member of the Nation of Islam. (ECF No. 1, PageID.3.)  In May of 2019, Mease was participating in the 2019 Ramadan fast when there was a scabies outbreak in his housing unit at URF.  Mease says that he learned of the outbreak on May 20, 2019, when he was summoned to his housing unit to begin a six-week quarantine and told to wait in line to be weighed. (*Id.*) While in line, Mease says that he was approached by Defendant McKinney, who allegedly stated: "go to your bunk or I'll put your ass in the hole."  Later that day, Mease says that he reported McKinney's comment to Defendant Wonnacott, who responded that CO McKinney was just having a bad day.  (*Id.*)  During that conversation, Mease also informed Wonnacott that he would be unable to take any scabies medication until sunset, as he was fasting for Ramadan.

Mease says that on May 22, 2019, PC Wonnacott held a meeting with Ramadan participants in Mease's housing unit, informing the inmates that "refusal to take the [scabies] medication at 1:00pm would result in 96 days in the hole."  (*Id.*)  According to Mease, all of the other Ramadan participants then broke their fast, but Mease

5

refused.  Mease says that he reported Wonnacott's threats to supervisory prison staff, and that they informed Mease that he could maintain his fast, but that he would have to be quarantined in administrative segregation while he waited to take the scabies medication.  (*Id.*, PageID.4.)  Mease therefore maintained his fast.  On May 24, 2019, Mease left quarantine and returned to his housing unit.  Upon his return, Mease says that he was denied his personal property and religious materials and was terminated from his prison job.[2]  (*Id.*)

On May 29, 2019, Mease says that a second round of scabies medication was dispensed to the prisoners.  Mease again maintained his fast and was quarantined.  (*Id.*)  Mease says that the inmates who took the medication during the day "were allowed normal movement with general population."  When Mease returned to his housing unit this time, on May 31, 2019, another inmate was placing his belongings in what had been Mease's assigned bunk.  (*Id.*)  When Mease asked why the inmate was moving into his bunk, the inmate replied that he was following Defendant Lemmerman's instructions.  Mease says that he then walked to the Westside Annex and informed prison staff that his bunk was occupied.  (*Id.*)  The staff told Mease to return to his unit and wait in the television room until PC Wonnacott could locate another bunk for Mease.  Mease complied but says that while he was in the television room, he observed CO Lemmerman writing him a misconduct ticket.[3]

---

[2]    This alleged adverse action forms the basis of Claim One.

[3]    This alleged adverse action forms the basis of Claim Two.

After Mease observed Lemmerman authoring a misconduct ticket against him, Mease says that he sought out the URF Inspector, and informed him that Mease's housing unit staff were retaliating against Mease for refusing to break his fast.  (*Id.*) Mease says that the Inspector responded that he "did not condone the taking of [Mease's] religious services and terminat[ion] . . . from MSI-Garment Factory."  The Inspector also allegedly told Mease that, but-for the scabies quarantine, he would have moved Mease to a new housing unit.  (*Id.*, PageID.4-5.)  Mease says that he returned to his unit and attempted to speak to PC Wonnacott about the retaliatory actions of his housing unit staff, but Wonnacott would not discuss the matter.  (*Id.*, PageID.5.)  The next day, Mease says that he submitted grievances concerning the retaliation.  Mease also reported the incidents to the Deputy Warden, who told Mease that he would have a conversation with his housing unit staff.  (*Id.*)

Mease says that on June 29, 2019, he "encountered" COs McKinney and Lemmerman.  According to Mease, McKinney began to make "childish gestures" implying that Mease had been crying about them to the Inspector and Deputy Warden.  (*Id.*)  Lemmerman then told Mease that the Inspector and Deputy Warden "don't run" Mease's housing unit.  Mease replied that COs McKinney and Lemmerman don't run Mease's housing unit either.  (*Id.*)  Later that day, Mease says that he asked McKinney and Lemmerman to sign his itinerary, so that he could move about the facility in accordance with the itinerary, but that McKinney and Lemmerman refused.[4]  The same day, Mease reported this incident to a staff member

---

[4]    This alleged adverse action forms the basis of Claim Three.

in the chow hall and filed grievances against McKinney and Lemmerman.  (*Id.*, PageID.5-6.)  On June 30, 2019, Mease learned that McKinney had issued him a Class III[5] misconduct ticket for "excessive noise."[6]  (*Id.*, PageID.6.)  The staff member who reviewed the misconduct allegedly checked the box indicating that Mease refused to sign off on the misconduct without consulting Mease.  When Mease asked why, the staff member indicated that it did not matter.  (*Id.*)  And when Mease asked for two grievance forms, Defendant Wech, who was nearby, allegedly stated: "here's four and make sure you get the name right." When Mease asked CO Wech what he was talking about, Wech allegedly responded: "we're a team, your ass is out of here."  (*Id.*)

Mease also says that CO Wech conducted the hearing for McKinney's excessive noise misconduct on July 5, 2019.  According to Mease, Wech found Mease guilty of the misconduct, and issued the maximum sanction for the misconduct: five days in top-lock.[7]  (*Id.*)  On July 7, 2019, McKinney conducted a hearing on a Class III misconduct ticket for "profanity" written by another staff member.  Mease says that McKinney found him guilty and issued to five days in top-lock.[8]  (*Id.*)

---

[5]    Violations of written rules within the MDOC are classified as either Class I, Class II or Class III misconducts. While Class I misconducts are considered "major" misconducts and are "subject to all hearing requirements set forth in MCL 791.252," Class II and III misconducts are considered "minor" misconducts and are "subject to all requirements currently set forth in Department Administrative Rules and policy directives for 'minor' misconducts."  MDOC Policy Directive (PD) 03.03.105 ¶ C (eff. Apr. 18, 2022).

[6]    This alleged adverse action forms the basis of Claim Four.

[7]    This alleged adverse action forms the basis of Claim Five.  "Top-lock" is a restriction of the prisoner to his own cell, room or bunk and bunk area. *See* MDOC Directive 03.03.105, ¶¶ OOO–QQQ.

[8]    This alleged adverse action forms the basis of Claim Six.

### III.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### IV.    Table of Claims

Mease's remaining claims are reflected in the table below.

| Claim Number | Defendant(s) | Claim | Date or Date Range of Incident(s) | Factual Allegations |
|---|---|---|---|---|
| One | McKinney, Wonnacott, Lemmerman | First Amendment Retaliation (property deprivation) | May 24, 2019 | Mease refused to break his fast despite PC Wonnacott's order and took his medication after sunset in administrative segregation instead.  When Mease returned to his housing unit, he was deprived of his personal property, terminated from his employment, and denied access to religious services. |
| Two | Lemmerman | First Amendment Retaliation (misconduct ticket) | May 31, 2019 | When Mease returned to his housing unit after refusing to break his fast for a second time, his bunk was occupied.  Despite complying with Lt. Bigger's direction to wait for a new room assignment in the TV Room, CO Lemmerman wrote him a misconduct ticket. |

9

| Claim Number | Defendant(s) | Claim | Date or Date Range of Incident(s) | Factual Allegations |
|---|---|---|---|---|
| Three | Lemmerman, McKinney | First Amendment Retaliation (refusal to sign itinerary) | June 29, 2019 | COs Lemmerman and McKinney retaliated against Mease by refusing to sign off on his itinerary to eat and go to the law library. |
| Four | McKinney | First Amendment Retaliation (misconduct ticket) | June 29, 2019 – June 30, 2019 | After COs Lemmerman and McKinney refused to sign off on Mease's itinerary to eat and go to the law library, Mease filed a grievance against them. The next day, Mease learned that McKinney issued him a Class III misconduct ticket. |
| Five | Wech | First Amendment Retaliation (maximum sanction for misconduct) | July 5, 2019 | CO Wech conducted the hearing for the Class III misconduct written by CO McKinney. Wech found Mease guilty and gave him the maximum sanction even though Mease had not been found guilty of a misconduct ticket for ten months prior. This sanction eventually led Mease's employer to terminate him. |
| Six | McKinney | First Amendment Retaliation (maximum sanction for misconduct) | July 7, 2019 | CO McKinney conducted the hearing for the Class III misconduct ticket written by CO Simpson. McKinney found Mease guilty and gave him the maximum sanction. This sanction eventually led Mease's employer to terminate him. |

Before analyzing these claims, the undersigned finds it necessary to address some of the misrepresentations in Mease's response brief regarding his remaining claims.

First, Mease avers that "[t]he Magistrate Judge and defendants are in error as to the remaining claims as plaintiff's claims of retaliatory transfer have never been dismissed." (ECF No. 90-1, PageID.533.) But this Court's screening opinion, issued in May of 2021, made no mention of a retaliatory transfer. (ECF No. 14, PageID.61.) Mease did not move this Court to reconsider its opinion on those grounds. Furthermore, the undersigned's R. & R. on Defendants' exhaustion-based motion for summary judgment clearly set forth Mease's remaining claims and made no mention of a retaliatory transfer claim. (ECF No. 39, PageID.251-252.) Mease did not object to the R. & R. on that basis. (*See* ECF No. 40.) As such, to the extent that Mease's

complaint set forth a retaliatory transfer claim, it is the undersigned's opinion that Mease has since abandoned that claim.[9]

Second, Mease avers that Claim One includes Defendant Wech.  But Mease's complaint made no allegations against Wech until Mease recounted the events of June 30, 2019.  (ECF No. 1, PageID.6.)  Mease's Claim One arose on May 24, 2019.

Third, Mease represents Claim Three as "Denial of Access to Courts."  (ECF No. 90-1, PageID.544.)  The Court has not construed Mease's complaint as setting forth a First Amendment Access to Courts claim; it has construed his complaint as setting forth a First Amendment retaliation claim.  (*See* ECF No. 14, PageID.63 ("Plaintiff's retaliation claims . . . remain in the case."); ECF No. 39, PageID.39 ("On May 13, 2021, this Court issued an Opinion and Order dismissing all but Mease's retaliation claims . . . ." (citations omitted)).)

Fourth and finally, Mease represents his Claim Three as pertaining to a June 29, 2019, refusal to sign-off on Mease's itinerary *and* a July 6, 2019, refusal to sign-off on his itinerary.  As the undersigned has previously noted, Mease did not include

---

[9]    But even if Mease had a retaliatory transfer claim, Defendants' exhaustion-based motion for summary judgment, and their accompanying brief, established that Mease never exhausted such a claim.  (*See* ECF No. 33.)  In Mease's verified complaint, he alleged that prison staff prepared his transfer order on July 10, 2019, and that he was transferred on July 18, 2019.  (ECF No. 1, PageID.7.)  Mease's grievance records demonstrate that Mease did not file and appeal any grievances through Step III of the grievance process after July 10, 2019.  (ECF No. 33-3, PageID.149.)    Mease's June 1, 2019 grievance stating that he "fears retaliatory actions to negatively effect [sic] his incarceration, and arbitrary transfer . . ." is plainly insufficient where he had not yet been transferred.  (ECF No. 33-3, PageID.174.)

the July 6, 2019, incident in his complaint.  (*See* ECF No. 39, PageID.257 n.12.)  As such, Claim Three pertains only to the June 29, 2019, incident.

## V.    Analysis

Mease asserts that Defendants retaliated against him in violation of his First Amendment rights.  Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated by the protected conduct.  *Id.*  The undersigned analyzes each of Mease's retaliation claims in turn.

### a.  Claim One

Mease first alleges that after he refused to break his fast and take his scabies medication, Defendants McKinney, Wonnacott, and Lemmerman retaliated against him by depriving Mease of his personal property, denying him access to religious services, and terminating his employment when he returned to his unit on May 24, 2019.  Defendants aver that "Claim One fails because Plaintiff lacks the proof of the three elements of retaliation against all Defendants and Wonnacott was not personally involved with any of the alleged conduct."  (ECF No. 75, PageID.434.)

### i.  Personal Involvement — Defendant Wonnacott

The undersigned first addresses Defendants' contention that PC Wonnacott was not personally involved in the actions underlying Mease's first retaliation claim. (ECF No. 75, PageID.438.)   In advancing this argument, Defendants rely on the following portion of Mease's January 17, 2023 deposition testimony:

> 3   Q    Okay.  So let me recap that.  When it comes to Defendant
> 4        Wonnacott, your claims against him are, first, the threat
> 5        for not taking the medicine and threatening 96 days in
> 6        segregation?
> 7   A    Right.
> 8   Q    And you also claim that Wonnacott failed to supervise the
> 9        officers underneath him, and let his underlings do whatever
> 10       they wanted; correct?
> 11  A    Yes.
> 12  Q    And then you also claim that --
> 13  A    But he put --
> 14  Q    What's that?
> 15  A    -- he failed to supervise, but he participated as well.  He
> 16       participated in the fact that he knew that these things were
> 17       going on and he allowed them to go on.  This is the kind of
> 18       atmosphere that he allowed to go on in the unit.  And that
> 19       was his job to stop that kind of stuff from going on,
> 20       because he knew that they had -- what was going on.  He knew
> 21       what was happening.  It's not that he did this stuff and
> 22       they didn't.  You know, he knew what was going on.  And yet
> 23       when we brung the issue to him, he just would not deal with
> 24       the issue.  He would not try to work the issue out.

(ECF No. 75-8, PageID.485.)

13

For a state actor to be held personally liable under § 1983, they must have been personally involved in the violation of the plaintiff's rights. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005); *Bennett v. Schroeder*, 99 F. App'x 707, 713-714 (6th Cir. 2004).   In other words, claims against public officials in their personal capacity "must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'" *Shehee v. Luttrell*, 199 F.3d 295 (6th Cir. 1999) (quoting *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir.1998)).   Mease cannot sue Wonnacott — or any other supervisory actor — under § 1983 under a theory of respondeat superior.   Instead, Mease must show that Wonnacott "at least implicitly authorized, approved *or* knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020) (emphasis added) (first quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984); and then citing 42 U.S.C. § 1983).

This Court addressed supervisory liability in its May 13, 2021, screening opinion in this case.  (ECF No. 14, PageID.42.)  There, the Court dismissed six of the named defendants on the grounds that Mease's claims against them were "premised on nothing more than respondeat superior liability." (*Id.*)  The Court did not come to the same conclusion with respect to PC Wonnacott.  To the contrary, the Court determined that Mease "alleged facts sufficient to state a claim" against Wonnacott (*Id.*, PageID.61.)  And to the extent that Defendants would argue that Mease's deposition testimony somehow contradicts the allegations in his verified complaint, the undersigned disagrees.  Mease not only attested that PC Wonnacott failed to

supervise his subordinates, but he also attested that Wonnacott knew about the retaliatory actions taking place, and nevertheless allowed them to continue.  (ECF No. 75-8, PageID.485.)  In other words, Mease attested that Wonnacott "knowingly acquiesced in the unconstitutional conduct" of his subordinates.  *See Garza*, 972 F.3d at 865.

Furthermore, it is worth noting that in moving for summary judgment, Defendants argue that Mease's property was taken in order to eradicate the scabies infestation, not in retaliation for Mease's refusal to take the scabies medication.  (ECF No. 75, PageID.435.)  In making this argument, Defendants rely on PC Wonnacott's sworn statements regarding the confiscation of Mease's property.  (*Id.* (citing ECF No. 75-2).)  For the foregoing reasons, it is the undersigned's opinion that at the very least, there are genuine issues of material fact as to PC Wonnacott's personal involvement in Mease's Claim One.  The undersigned therefore turns to the elements of the claim.

### ii.  Protected Conduct

As set forth above, plaintiffs asserting claims of retaliation must first establish that they were engaged in protected conduct.  Defendants aver that Mease's refusal to break his fast in order to obtain medical treatment did not constitute protected conduct.  (ECF No. 75, PagID.436.)  Defendants cite various cases in which courts determined that an inmate's refusal of medical treatment does not constitute protected conduct.  (*Id.*, PageID.436-437 (first citing *Langford v. Prima,* No. 17-CV-11862, 2018 WL 659247, at *5 (E.D. Mich. Feb. 1, 2018); then citing *Carter v. Ayala,*

No. 1:13-CV-807, 2014 WL 4660346, at *3 (W.D. Mich. Aug. 20, 2014); and then citing *Heard v. Landfair*, No. 20-11680, 2022 WL 13800829, at *3 (E.D. Mich. Oct. 21, 2022)).) Defendants argue that Mease's conduct was "no different from the situations in *Langford*, *Carter*, or *Heard*." (*Id.*, PageID.438.) The undersigned disagrees.

Although Defendants characterize Mease's conduct as "refusing medical treatment" (*id.*, PageID.436), it is the undersigned's opinion that Mease's conduct is better characterized as refusing to break his fast, in adherence to his religious beliefs. Defendants concede that "Mease was ultimately refusing medications because of Ramadan." (*Id.*) And there appears to be no question that Mease was willing to take the scabies medication once the sun set. As such, the issue is whether Mease's exercise of his religious beliefs constituted protected conduct.[10] And that is not an issue that Defendants addressed in their brief.[11] The undersigned therefore considers

---

[10]    Mease avers that his oral complaints to Wonnacott regarding McKinney's behavior, and to supervisory staff regarding Wonnacott's threat that "refusal to take the [scabies] medication at 1:00pm would result in 96 days in the hole" also constituted protected conduct. (ECF No. 90-1, PageID.538-539.) To be sure, non-frivolous oral grievances constitute protected conduct. *Maben*, 887 F.3d at 265. But it is worth noting that in his complaint, Mease alleges that Defendants deprived him of his property, employment, and religious services "because he had refused to break his fast during Ramadan," not because he had made oral grievances against them. (ECF No. 1, PageID.4.) It is not until his response that he claims Defendants were motivated by his refusal to break his fast *and* his oral grievances. (ECF No. 90-1, PageID.538.)

[11]    Several courts have determined, or at least suggested, that the exercise of religious beliefs falls within the scope of protected conduct for the purposes of First Amendment retaliation claims. *See, e.g.*, *Lasche v. New Jersey*, No. 20-2325, 2022 WL 604025, at *4-*5 (3d Cir. Mar. 1, 2022) (finding that plaintiffs had "a plausible claim of retaliation" where the New Jersey Division of Child Placement and Permanency removed their foster child from their care and suspended their foster license based on their religious beliefs); *Hamilton v. Hernandez*, 500 F. App'x 592, 595 (9th Cir. 2012) (assuming that the plaintiff-prisoner's "exercise of religion and

whether Defendants have discharged their burden with respect to the remaining elements of Mease's claim.

### iii.  Adverse Actions

To establish the second element of a retaliation claim, a prisoner-plaintiff must show an action by a prison official that would be sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *Thaddeus-X*, 175 F.3d at 396. The adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted. The relevant question is whether the defendants' conduct is "capable of deterring a person of ordinary firmness;" the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (emphasis in original).

Mease alleges that Defendants McKinney, Wonnacott, and Lemmerman took three adverse actions against him when he returned to his housing unit on May 24, 2019: (1) they deprived Mease of his property, (2) they denied Mease access to religious services, and (3) they terminated Mease from his prison job. Although Defendants assert that Mease cannot establish any of the elements of his first retaliation claim (ECF No. 75, PageID.434), Defendants do not deny that the alleged

---

use of prison grievance procedures" satisfied the protected conduct element of his First Amendment retaliation claim); *Humple v. Hilewitz*, No. 2:13-CV-14618, 2016 WL 1117600, at *4 (S.D.W. Va. Mar. 22, 2016) (dismissing the plaintiff-prisoner's First Amendment retaliation claim because there was no evidence that he was exercising his religious beliefs prior to the alleged adverse action); *Cathedral Church of The Intercessor v. Inc. Vill. of Malverne*, 353 F. Supp. 2d 375, 387 (E.D.N.Y. 2005) (finding that "Plaintiffs' right to exercise their religious beliefs is clearly a fundamental First Amendment right" satisfying the first element of their retaliation claim).

actions are capable of deterring a person of ordinary firmness from engaging in protected conduct.  Defendants simply contend that their actions were not in fact motivated by Mease's refusal to break his fast.  That contention sounds in the third element of Mease's claim: causation.

### iv.  Causal Nexus

To prevail on a retaliation claim, retaliatory motive "must be a 'but-for' cause [of the injury], meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019).  At the summary judgment stage, the Sixth Circuit employs a burden-shifting approach with regards to the causal requirement:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant.  If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Blatter*, 175 F.3d at 399.  Mease's evidence of retaliatory motive appears to consist of the temporal proximity between the alleged protected conduct and adverse actions, and Wonnacott's alleged threat that "refusal to take the [scabies] medication would result in 96 days of the hole."  (ECF No. 1, PageID.3.)

But Defendants contend that after the scabies outbreak in Mease's housing unit, they had to take actions for the health and safety of the inmates.  (ECF No. 75, PageID.429, 435.)  One such action was to place Mease in isolation so that he could take the scabies medication without breaking his fast, and without putting other prisoners at risk of contracting scabies.  Another was bagging the inmates' property,

so as to kill any scabies mites living on the property.  (*Id.*)  And as to Mease's allegation that he was terminated in retaliation for his refusal to break his fast, Defendants point out that Mease was not terminated until July of 2019.  (*Id.*, PageID.429.)

In the opinion of the undersigned, Mease has provided sufficient evidence of retaliatory motive to shift the burden of production to Defendant Wonnacott to establish that he would have taken the same actions absent Mease's refusal to break his fast.  But Mease has not provided sufficient evidence of retaliatory motive to shift the burden of production to Defendants McKinney or Wonnacott.  True, mere days separated Mease's refusal to break his fast and the alleged adverse actions.  But while temporal proximity may constitute circumstantial evidence of retaliatory motive, courts are reluctant to find that temporal proximity alone is sufficient to establish retaliatory motive.  *Hill*, 630 F.3d at 476 (citing *Holzemer v. City of Memphis*, 621 F.3d 512, 526 (6th Cir. 2010)).  And as recognized above, the only other allegation that arguably suggests retaliatory motive is PC Wonnacott's threat that "refusal to take the [scabies] medication would result in 96 days of the hole."  (ECF No. 1, PageID.3.)  That statement demonstrates no knowledge of Mease's protected conduct or intent to retaliate on the part of CO Lemmerman or CO McKinney.  The undersigned therefore considers whether Wonnacott has shown that he would have taken the alleged adverse actions regardless of Mease's refusal to break his fast.

### 1.  Property

Defendant Wonnacott avers that Mease was deprived of his personal property in accordance with scabies protocol, which includes temporarily bagging up inmate property. (ECF No. 75-2, PageID.452 (Wonnacott Aff.).)  In response to PC Wonnacott's proffered justification, Mease attests that when he returned to his housing unit, the other inmates in his unit had their property.  (ECF No. 90-2, PageID.548 (Mease Aff.).)  Furthermore, Mease attests that housing unit staff informed him that the inmates had their "clothes, beddings, and towels washed and returned" but that "all other property (books, papers, photos, appliances, medications, hygiene, legal and religious materials, etc.) they were allowed to keep."  (*Id.*)  And when URF staff finally returned Mease's property on May 31, 2019, he says that it was not in a plastic bag and had not been washed.  (*Id.*, PageID.548-549.)  Defendant Wonnacott maintains that all of the inmates in Mease's housing unit were treated the same, and that their property was temporarily taken to prevent the spread of scabies in the unit.  (ECF No. 96, PageID.569 (citing ECF No. 75-2, PageID.452).)

Scabies is "an infestation of the skin by the human itch mite." *Scabies Frequently Asked Questions (FAQs)*, CDC (Sept. 1, 2020), https://www.cdc.gov/parasites/scabies/gen_info/faqs.html.  Per the Centers for Disease Control and Prevention, "[s]cabies can spread rapidly under crowded condition where close body and skin contact is frequent."  *Id.*  Scabies can spread through skin-to-skin contact, or "by sharing articles such as clothing, towels, or bedding used by an infested

person." *Id.*  When an individual has been diagnosed with scabies, the CDC recommends the following:

> All household members and other potentially exposed persons should be treated at the same time as the infested person to prevent possible reexposure and reinfestation.  Bedding and clothing worn or used next to the skin anytime during the 3 days before treatment should be machine washed and dried using hot water and hot dryer cycles or be dry-cleaned.  Items that cannot be dry-cleaned or laundered can be disinfested by storing in a closed plastic bag for several days to a week. Scabies mites generally do not survive more than 2 to 3 days away from human skin.

*Prevention  &  Control*, CDC (Oct. 31, 2018), https://www.cdc.gov/parasites/ scabies/prevent.html.

There is no question that Mease's housing unit was in the midst of a scabies outbreak in late May of 2019.  With the CDC's guidance in mind, PC Wonnacott had a legitimate, non-retaliatory reason for confiscating Mease's property at that time; that is, the need to control the scabies outbreak in Mease's housing unit.  Mease avers that his property was handled differently than the other inmates in his housing unit, but that argument is unpersuasive for two reasons: (1) Mease's only evidence that staff confiscated property from him that they did not confiscate from other prisoners is a hearsay statement from a staff member, and (2) Mease's circumstances were not the same as the rest of the inmates in his unit.

As an initial matter, the undersigned notes that a party opposing a motion for summary judgment cannot use hearsay evidence to create a genuine issue of material fact.  *See Weberg v. Franks*, 229 F.3d 514, 526 n.3 (6th Cir. 2000) (disregarding allegations made in a verified complaint on the grounds that they were based on

hearsay rather than personal knowledge).  Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Accordingly, Mease's verified statement that he was "informed that prisoners had their clothes, beddings, and towels washed and returned or exchanged, and all other property (books, papers, photos, appliances, medications, hygiene, legal and religious materials, etc.) they were allowed to keep," is hearsay evidence that Mease cannot rely on to create a genuine issue of material fact.

Furthermore, per Mease's own allegations, every other inmate in his housing unit took the scabies medication during the day.  (ECF No. 1, PageID.3.)  PC Wonnacott attests that staff then confiscated the inmates' property in accordance with scabies guidelines.  (ECF No. 75-2, PageID.452.)  In adherence to his religious beliefs, Mease took the medication after sunset, which required a temporary stay in isolation.  While in isolation, URF staff took possession of Mease's property in an effort to eradicate the scabies outbreak in Mease's housing unit.  (*Id.*)  In the undersigned's opinion, Wonnacott has shown that he would have confiscated Mease's property regardless of whether Mease exercised his religious beliefs.[12]  The undersigned therefore turns to the remaining alleged adverse actions.

---

[12]    In *Ellis v. Bryant*, a magistrate judge in the Western District of Oklahoma similarly recommended that the court grant summary judgment on plaintiff's claim that his property was confiscated in retaliation for his protected conduct where the confiscated property was infested with bed bugs.  No. CV-18-1092-D, 2019 WL

## 2.  Religious Services

In addition to confiscating his property, Mease alleges that when he returned to his cell on May 24, 2019, Defendants began depriving him of his religious services. Defendants do not address Mease's allegation that he was deprived of religious services at all.  This is despite Defendants' inclusion of this alleged adverse action in their claims table.  (ECF No. 75, PageID.425.)

The undersigned acknowledges that Mease's own verified allegations indicate that Mease's entire housing unit was quarantined for six-weeks due to the scabies outbreak.  (ECF No. 1, PageID.3 ("On May 20th, 2019, [Mease] was summoned to return to C-Unit to be placed on a 6 week quarantine due to a scabies outbreak.").)  To the extent that the religious services took place outside of the housing unit, one might infer that Mease was not permitted to attend his religious services due to the quarantine.  But Mease also provided declarations from inmates in his housing unit saying that they were permitted to leave the housing unit as early as May 29, 2019.  (*Id.*, PageID.20-21.)  Because Mease has provided some evidence of retaliatory motive on the part of PC Wonnacott, Wonnacott bore the burden of establishing that he would have deprived Mease of his religious services regardless of Mease's refusal to break his fast.  In the undersigned's opinion, PC Wonnacott did not meet his burden.

---

5460697, at *6-7 (W.D. Okla. Oct. 7, 2019), *R. & R. adopted*, No. CIV-18-1092-D, 2019 WL 5457819 (W.D. Okla. Oct. 24, 2019).

### 3. Termination

The undersigned now turns to the final alleged adverse action in this claim: Defendants' termination of Mease from his prison job.  In his complaint, Mease initially alleged that he was terminated upon his return to his housing unit on May 24, 2019, in retaliation for his refusal to break his fast.  (ECF No. 1, PageID.4.)  But later in Mease's complaint, he alleged that three COs — among them Defendants McKinney and Wech — issued misconduct tickets or maximum sanctions for misconduct tickets in an effort to retaliate against him in late June and early July of 2019.[13]  (*Id.*, PageID.6-7.)  Mease alleged that these retaliatory misconduct tickets and sanctions resulted in his termination. (*Id.*, PageID.7.)  A job evaluation attached to Mease's complaint clarifies the date and reason that Mease was terminated.  (*Id.*, PageID.92.)  The pertinent portion of that job evaluation, dated July 9, 2019, is shown below.

**COMMENTS AND RECOMMENDATIONS:**
MR. MEASE CURRENTLY WORKS ON THE PREP LINE FOR RAINWEAR.  HE STAYS FOCUSED, PUTS OUT QUALITY WORK & KEEPS UP WITH PRODUCTION.  WORKS WELL WITH STAFF & CO-WORKERS.  MR. MEASE RECEIVED 15 DAYS OF TOP LOCK FOR A CLASS II OR III MISCONDUCT CHARGE.  CANNOT COME BACK TO MSI FOR 6 MONTHS.  WILL HIRE BACK.

(*Id.*)

Clearly, Mease was not terminated upon his return to his housing unit on May 24, 2019.  Rather, Mease was terminated in July of 2019 based on the misconduct ticket and sanctions that he received in late June and early July of 2019.  Mease

---

[13]    Mease's claims against CO McKinney for issuing a retaliatory misconduct ticket and for issuing retaliatory sanctions during a misconduct hearing remain, and are addressed later in this R. & R.  As does Mease's claim against CO Wech for issuing retaliatory sanctions during a misconduct ticket.

therefore cannot maintain that Defendant Wonnacott retaliated against him by terminating his employment when he returned to his unit on May 24, 2019.

In sum, the undersigned recommends that the Court grant in part and deny in part Defendants' motion for summary judgment with respect to Mease's Claim One. The undersigned first recommends that the Court grant Defendants McKinney and Lemmerman summary judgment on Claim One because Mease did not provide sufficient evidence of McKinney and Lemmerman's retaliatory motive.   The undersigned next recommends that the Court grant Defendant Wonnacott summary judgment as to Mease's claim that Wonnacott retaliated against him by confiscating his property and terminating his employment on May 24, 2019; there are no genuine issues of material fact and the evidence on the record establishes that Wonnacott's retaliatory motive was not the but-for cause of these actions.   But the undersigned recommends that the Court deny Defendant Wonnacott summary judgment as to Mease's claim that Wonnacott retaliated against Mease by depriving him of religious services because there are genuine issues of material fact bearing on the causation element of the claim.

### b.  Claim Two

The undersigned now turns to Mease's claim that after he returned to his housing unit on May 31, 2019, CO Lemmerman wrote him a retaliatory misconduct ticket.  Defendants aver that this claim fails because CO Lemmerman did not in fact issue Mease a misconduct ticket, and CO Lemmerman therefore did not take an adverse action against Mease.  (ECF No. 75, PageID.440.)  Mease agrees that the

misconduct ticket was never issued, but argues that he watched CO Lemmerman write the ticket, and that the threat of the ticket was a sufficiently adverse action. (ECF No. 90-1, PageID.543.)

An adverse action is an action sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *Thaddeus-X*, 175 F.3d at 396. Misconduct tickets are often recognized as adverse actions sufficient to support a retaliation claim. *See Brown v. Crowley,* 312 F.3d 782 (6th Cir. 2002) (finding that the issuance of a major misconduct ticket, which subjected the prisoner to a risk of segregation, loss of good time, and a longer term of incarceration, was sufficiently adverse); *Maben v. Thelen*, 887 F.3d 252, 266-267 (6th Cir. 2018) (finding that the issuance of a minor misconduct ticket was sufficiently adverse where the prisoner lost privileges and could have been confined to his cell). Furthermore, "the threat of adverse action can satisfy this element if the threat is capable of deterring a person of ordinary firmness from engaging in the protected conduct." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010). However, it is the undersigned's opinion that CO Lemmerman's alleged conduct does not rise to the level of an adverse action.

Mease alleges that upon his return to his housing unit on May 31, 2019, another inmate was in his bunk. (ECF No. 1, PageID.4.) The inmate informed Mease that CO Lemmerman had directed him to take Mease's bunk. After this encounter, Mease says that he walked to the Westside Annex to tell facility staff that his bunk was occupied. (*Id.*) When he returned to his housing unit, Mease says that he witnessed CO Lemmerman authoring a misconduct ticket, and that he "[saw] his

26

name on the misconduct." (*Id.*)  In the undersigned's opinion, these are not the kinds of circumstances under which courts have determined that retaliatory threats may constitute adverse actions.  *See, e.g.*, *Blatter*, 175 F.3d at 398 (finding that threats of physical harm may constitute adverse actions); *Smith v. Yarrow*, 78 F. App'x 529, 542-43 (6th Cir. 2003) (finding that threats to falsify drug tests may constitute adverse actions); *Pasley v. Conerly*, 345 F. App'x 981, 985 (6th Cir. 2009) (finding that threats to terminate the plaintiff from his job and have him transferred to a remote location far from his family may constitute adverse action).

Even accepting that CO Lemmerman began to author a misconduct ticket against Mease on May 31, 2019, Mease provided no evidence that Lemmerman intended for Mease to see him writing the misconduct ticket.  *Cf. Brown v. Smith*, No. 1:18-CV-1147, 2018 WL 6011243, at *1, 4 (W.D. Mich. Nov. 16, 2018) (finding that the plaintiff stated a retaliation claim where he allegedly threatened to file a grievance against the defendant, and the defendant immediately responded: "if you write a grievance on me, I will write a fake ticket on you and get your ass rode out to Level V.").  In *Blatter*, the Court recognized that "certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations[.]" 175 F.3d at 398.  *See also Cottrell v. Hamlin*, No. 2:20-CV-12886, 2021 WL 2822932, at *2 (E.D. Mich. July 7, 2021) (finding that the defendant's "brief, unacted upon" threat to file a misconduct charge was a "literally inconsequential statement that would not deter an ordinary person from exercising his rights").  In the opinion of the

undersigned, Lemmerman's threat, to the extent it can be labeled as such, was *de minimis*.

Furthermore, even had CO Lemmerman taken an adverse action against Mease by beginning to write, and then ultimately deciding not to issue, a misconduct ticket for wearing a coat in the TV room, it is the undersigned's opinion that Mease has not provided sufficient evidence that Lemmerman was motivated by Mease's protected conduct. As set forth above, retaliatory motive must be the but-for cause of the adverse action. *Nieves*, 139 S. Ct. at 1721. And at the summary judgment stage, Mease must "me[et] his burden of establishing that his protected conduct was a motivating factor behind any harm." *Blatter*, 175 F.3d at 399.

Mease says that he refused to break his fast on May 22, 2019, and again on May 29, 2019. (ECF No. 1, PageID.4.) Mease further alleges that when he returned to his housing unit on May 31, 2019, a prisoner was placing his belongings in Mease's bunk. That prisoner allegedly told Mease that he was following CO Lemmerman's instructions, leading Mease to walk to the Westside Annex and inform staff that his bunk was occupied. (*Id.*)

The only evidence that Mease can point to for retaliatory motive is the temporal proximity between his actions and the actions of CO Lemmerman. Mease does not so much as allege that Lemmerman was aware of his refusal to break his fast. (*See* ECF No. 1, PageID.4.) And although Mease alleges that he complained about CO Lemmerman to the URF Inspector, and that the Inspector spoke to

Lemmerman, that complaint occurred *after* Mease's encounter with Lemmerman on May 31, 2019.  (*Id.*)

In sum, the undersigned recommends that the Court grant Defendants' motion for summary judgment with respect to Mease's Claim Two for two reasons.  First, CO Lemmerman's alleged conduct under the alleged circumstances — beginning to write and then ultimately deciding not to issue Mease a misconduct ticket — does not rise to the level of an adverse action.  And second, a reasonable juror could not determine based on the record before the Court that CO Lemmerman's actions on May 31, 2019, were motivated by Mease's prior protected conduct.

### c.  Claim Three

Mease next alleges that after he filed a grievance against PC Wonnacott, CO Lemmerman, and CO McKinney, Lemmerman and McKinney retaliated against Mease by refusing to sign off on his itinerary to eat and go to the law library on June 29, 2019.  (ECF No. 1, PageID.5.)  Defendants again argue that Mease's claim fails on its second element.  According to Defendants, Mease did not need staff signatures in order to follow the itinerary; the itinerary itself acted as authorization for Mease to go to lunch and to the law library.  So, even accepting that Lemmerman and McKinney declined to sign the itinerary, that refusal was not an adverse action.

In support of their statements, Defendants point to their own affidavits (ECF No. 75-6, PageID.473 (McKinney Aff.); ECF No. 79-1, PageID.498 (Lemmerman Aff.)), as well Michigan Department of Corrections Policy Directive 04.04.130: *Prisoner Movement within an Institution*.  The pertinent part of that policy provides as follows:

OFFENDER DAILY SCHEDULE

D.  An Offender Daily Schedule shall be generated for each prisoner by OCMS.  The schedule operates as the prisoner's itinerary for all call-outs for the identified day.  The schedule shall identify the prisoner by name, number, and lock and identify each assignment and activity for which the prisoner is scheduled, including locations and arrival and departure times.  The schedule also shall include any specific requirements for the call-out (e.g., special clothing required) and other information as approved by the Warden or designee.  The schedules shall be distributed to prisoners in advance of the call-out at a time when most prisoners are in their cells or rooms and available to receive the schedule (e.g., during evening count).

E.  The Offender Daily Schedule authorizes a prisoner to move unescorted to and from identified assignments and activities within the institution, subject to Paragraph S.  Prisoners must carry their schedules to and from scheduled assignments and activities and are required to produce the schedule upon staff request.  The Warden also may require that prisoners return the schedule to staff upon its expiration.

. . . .

S.  The Warden may require prisoners to be escorted to their destination even if an Offender Daily Schedule or pass has been issued.

(ECF No. 75-4, PageID.459-460.)  Defendants then point to Mease's Offender Work Schedule History Report, displayed below.

**Michigan Department of Corrections**
**Offender Callout Management System**
**Offender Work Schedule History Report**
**For: 213302 – MEASE, JOHN EUGENE**
**Unit H : Lock  86**

Location: CHIPPEWA CORRECTIONAL FACILITY                                                                    Report Date: 4/4/2023

| Date | Callout | Status | Reporting Station | Room | Schedule | Scheduled Arrival | Actual Arrival | Scheduled Departure | Actual Departure |
|---|---|---|---|---|---|---|---|---|---|
| 6/21/2019 | Paid Work | Scheduled | MSI - URF-W MSI BUILDIN( | GARMENT | 10:45 - 14:45 | 10:45 | 00:00 | 14:45 | 00:00 |
| 6/21/2019 | Wiffleball | Scheduled | SCHOOL URF-W MSI Officers S | Classroom 3 | 19:20 - 20:20 | 19:20 | 00:00 | 20:20 | 00:00 |
| 6/24/2019 | Paid Work | Scheduled | MSI - URF-W MSI BUILDIN( | GARMENT | 06:45 - 10:00 | 06:45 | 00:00 | 10:00 | 00:00 |
| 6/24/2019 | Paid Work | Scheduled | MSI - URF-W MSI BUILDIN( | GARMENT | 10:45 - 14:45 | 10:45 | 00:00 | 14:45 | 00:00 |
| 6/24/2019 | Exercise | Scheduled | PAVILION URF-W PAVILION | GYM | 19:00 - 20:15 | 19:00 | 00:00 | 20:15 | 00:00 |
| 6/25/2019 | Paid Work | Scheduled | MSI - URF-W MSI BUILDIN( | GARMENT | 06:45 - 10:00 | 06:45 | 00:00 | 10:00 | 00:00 |
| 6/25/2019 | Paid Work | Scheduled | MSI - URF-W MSI BUILDIN( | GARMENT | 10:45 - 14:45 | 10:45 | 00:00 | 14:45 | 00:00 |
| 6/26/2019 | Paid Work | Scheduled | MSI - URF-W MSI BUILDIN( | GARMENT | 06:45 - 10:00 | 06:45 | 00:00 | 10:00 | 00:00 |
| 6/26/2019 | Paid Work | Scheduled | MSI - URF-W MSI BUILDIN( | GARMENT | 10:45 - 14:45 | 10:45 | 00:00 | 14:45 | 00:00 |
| 6/26/2019 | Game | Scheduled | PAVILION URF-W PAVILION | GYM | 19:10 - 20:20 | 19:10 | 00:00 | 20:20 | 00:00 |
| 6/27/2019 | Paid Work | Scheduled | MSI - URF-W MSI BUILDIN( | GARMENT | 06:45 - 10:00 | 06:45 | 00:00 | 10:00 | 00:00 |
| 6/27/2019 | Paid Work | Scheduled | MSI - URF-W MSI BUILDIN( | GARMENT | 10:45 - 14:45 | 10:45 | 00:00 | 14:45 | 00:00 |
| 6/28/2019 | Paid Work | Scheduled | MSI - URF-W MSI BUILDIN( | GARMENT | 06:45 - 10:00 | 06:45 | 00:00 | 10:00 | 00:00 |
| 6/28/2019 | Paid Work | Scheduled | MSI - URF-W MSI BUILDIN( | GARMENT | 10:45 - 14:30 | 10:45 | 00:00 | 14:30 | 00:00 |
| 6/28/2019 | Law Library | Scheduled | PROG. BUILDING URF-W F | LIBRARY | 14:30 - 14:45 | 14:30 | 00:00 | 14:45 | 00:00 |
| 6/28/2019 | Health Care (Other) | Scheduled | HEALTH CARE URF-W MEI | MED. WINDOW | 14:45 - 15:00 | 14:45 | 00:00 | 15:00 | 00:00 |
| 6/28/2019 | Law Library | Scheduled | PROG. BUILDING URF-W F | LIBRARY | 15:00 - 15:30 | 15:00 | 00:00 | 15:30 | 00:00 |
| 6/29/2019 | Wiffleball | Scheduled | SCHOOL URF-W Officers S | Classroom 3 | 19:20 - 20:20 | 19:20 | 00:00 | 20:20 | 00:00 |
| 6/29/2019 | Library | Scheduled | PROG. BUILDING URF-W F | LIBRARY | 12:30 - 14:30 | 12:30 | 00:00 | 14:30 | 00:00 |
| 6/29/2019 | Law Library | Scheduled | PROG. BUILDING URF-W F | LIBRARY | 14:30 - 15:30 | 14:30 | 00:00 | 15:30 | 00:00 |
| 7/1/2019 | Paid Work | Scheduled | MSI - URF-W MSI BUILDIN( | GARMENT | 06:45 - 10:00 | | | | |

(ECF No. 75-5, PageID.468.)

In response, Mease points to the following portion of a URF Posted Rule:

12. Prisoners receive an "Offender Daily Schedule" (Itinerary) for the days scheduled callouts. You are to review the Housing Unit Log/Callout Report (kept at the Officer's desk) for scheduled callouts daily. Prisoners must immediately inform staff if they do not receive an itinerary. Failure to receive an "Offender Daily Schedule" is **NOT** a valid reason for failing to report to a callout. Prisoners on Top lock or LOP must get officer's permission prior to reviewing the Housing Unit Log/Callout Report. Before leaving the unit it is the responsibility of the prisoner to obtain authorization from the officer or to obtain a pass if necessary, no sooner than ten minutes prior to your callout. Prisoners on Top Lock must obtain a pass prior to leaving the unit for any reason.

13. Prisoners are not allowed to exit the unit without staff authorization by a signed pass, itinerary, or unit announcement for mass movement. In addition, prisoners returning from a callout must immediately notify unit staff upon entering the unit. All issued passes must be returned to unit staff upon return to the unit.

(ECF No. 90-3, PageID.552.)    He also provides affidavits from two individuals formerly incarcerated at URF, who attest that at the relevant time, prisoner itineraries had to be initialed by unit staff prior to movement.   (ECF No. 90-6, PageID.556-557.)

The undersigned notes that the posted rule provided by Mease does not appear to contradict the policy directive provided by Defendants.  It appears that there are three mechanisms for authorizing inmate movement at the facility: (1) a signed pass, (2) an itinerary, and (3) a unit announcement for mass movement.  (ECF No. 90-3, PageID.552.) The posted rule does not appear to require inmates to obtain additional authorization for their itineraries.  However, it is the undersigned's opinion that the affidavits of Mease's fellow inmates create a genuine issue of material fact as to whether URF staff nevertheless required inmates to obtain authorization for their itineraries.  (ECF No. 90-6, PageID.556-557.)  And if the practice within the facility was to require staff authorization prior to prisoner movement, then staff's refusal to sign off on an itinerary for the law library may dissuade a person of ordinary firmness from engaging in protected conduct.

In sum, the undersigned finds that there is a genuine issue of material fact bearing on the second element of Mease's claim that Defendants Lemmerman and

McKinney retaliated against him by refusing to sign off on his itinerary on June 29, 2019 (Claim Three).  As the lack of adverse action was Defendants' sole basis for arguing that they are entitled to summary judgment on this claim, the undersigned recommends that the Court deny summary judgment as to Mease's Claim Three.

### d.  Claim Four

The undersigned now turns to Mease's fourth remaining claim.  Mease says that after COs Lemmerman and McKinney refused to sign off on his itinerary to eat and go to the law library, he complained to a URF Sergeant and then filed a grievance against them.  (ECF No. 1, PageID.6.)  The next day, Mease learned that CO McKinney had issued him a retaliatory Class III misconduct ticket for excessive noise.  (*Id.*)  Defendants argue that because Mease was not required to have COs Lemmerman and McKinney sign off on his itinerary before leaving his housing unit, his grievance was frivolous.  (ECF No. 75, PageID.442.)  Because his grievance was frivolous, Defendants say that it did not constitute protected conduct.  Defendants also contend that the misconduct ticket was issued on June 29, 2019, the day before Mease filed his grievance.  (*Id.*)  And Defendants say that even if Mease can show a causal connection, CO McKinney's affidavit establishes that he would have issued the misconduct ticket regardless of Mease's protected conduct.  (*Id.*)

The Sixth Circuit has explained that "protected conduct includes a prisoner's 'undisputed First Amendment right to file grievances against prison officials on his own behalf.'" *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (quoting *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000)).  "If the grievances are frivolous,

however, this right is not protected." *Id.* Prisoners "cannot exercise that right in a manner that violates legitimate prison regulations or penological objectives." *Smith*, 250 F.3d at 1037. "'Abusive or manipulative use of a grievance system [is] not … protected conduct,' and prison officials may take action in response to the prisoner's improper use of the grievance process as long as the response aligns with a legitimate penological goal." *Griffin v. Berghuis*, 563 F. App'x 411, 416 (6th Cir. 2014) (quoting *King v. Zamiara*, 680 F.3d 686, 699 (6th Cir. 2012)).

Beyond the general acknowledgment that grievances used to abuse or manipulate the grievance system are frivolous, limited authority exists as to what renders a grievance frivolous. As acknowledged by the Sixth Circuit in *Maben*, "cases in this Circuit appear to suggest that a prisoner's grievance is frivolous when the underlying grievance itself is *de minimis*." 887 F.3d at 264–65 (collecting cases). This Court has also found grievances involving "verifiably untrue" allegations to be frivolous. *Chrzan v. Mackay*, No. 1:19-cv-116, 2020 WL 7774741, at *3 (W.D. Mich. Nov. 30, 2020) (finding that the plaintiff's grievance was frivolous where a video recording of the underlying event contradicted the allegations in the grievance), *R. & R. adopted*, No. 1:19-cv-116, 2020 WL 7773419 (W.D. Mich. Dec. 30, 2020).

In the undersigned's opinion, there are genuine issues of material fact bearing on whether Mease's grievance was frivolous.  As set forth above, Mease and other URF inmates attest that they were required to have staff sign off on their itinerary prior to leaving their housing unit during the relevant time.  Furthermore, Mease's

grievances and grievance responses are a part of the record.  A portion of the Step I

grievance form for grievance <u>URF-19-07-1847-17A</u> is shown below:

| MICHIGAN DEPARTMENT OF CORRECTIONS | | | | CSJ-247S 3/18/2019 |
|---|---|---|---|---|

**STEP I GRIEVANCE RESPONSE SUPPLEMENTAL FORM**
(Use if space on the CSJ-247A is insufficient for a full response by stating on the CSJ-247A "See attached CSJ-247S")

| Prisoner Last Name: | Prisoner #: | Lock/Location: | | Grievance #: |
|---|---|---|---|---|
| MEASE | 213302 | C-/235 | | 19-07-18-47-17A |
| Prisoner Interviewed: | YES ☐  NO ☒ | If "NO", Reason: | Prisoner Refused | |
| Extension Granted: | YES ☐  NO ☐ | If "YES", Enter End Date: | IF "YES", Enter End Date | |

**COMPLAINT SUMMARY:**
Mease # 213302 claims C/O McKinney and C/O Lemmerman refused to sign his Law Library pass for 1230 to 1530 on 6/29/19. Mease is claiming they are denying him access to the URF Law Library. Mease claims they did this in retaliation for complains to supervisors and grivances Mease has filed against them.

**INVESTIGATION SUMMARY:**
C/O McKinney was interviewed and claims he told Mease to have C/O Lemmerman sign his pass at this time. C/O McKinney claims Mease instantly had an addidute towards him and started mumbling words that C/O McKinney could not understand.

C/O Lemmerman was interviewed and states " Mease never approched me to have him sign a pass of any kind".

Mease refused to cooperate with the interview.

**APPLICABLE POLICY, PROCEDURE, ETC.:**
PD 03.03.130 I #6

**DECISION SUMMARY:**
I find C/O McKinney and C/O Lemmerman to be credible officers and do their job duties in a proffesional mannor at all times. Mease refused to cooperate with the interview by this writer.

Grievance denied at step 1

(ECF No. 33-3, PageID.158.)  When the grievance was investigated, CO McKinney

informed the respondent that he told Mease to ask CO Lemmerman for a signature.

It is counterintuitive that McKinney would direct Mease to another officer if there

was no need for a signature in the first place.  And it is worth noting that the

grievance was not denied on the grounds that Mease did not need a signature on his

itinerary; it was denied because the respondent did not believe that COs McKinney and Lemmerman were retaliating against Mease.

As to Defendants' allegation that CO McKinney issued the misconduct ticket the day before Mease filed his grievances, Defendants cite to the incorrect grievance. Like the excessive noise misconduct ticket (ECF No. 1, PageID.53), the Step I form for grievance URF-19-07-1847-17A is dated June 29, 2019 (ECF No. 33-3, PageID.157).  Furthermore, Mease alleged that he made a verbal complaint to a URF Sergeant during lunch on June 29, 2019.  (ECF No. 1, PageID.5-6.)  The record before the Court does not definitively establish which came first — the grievances or the misconduct ticket.

Finally, while Defendants assert that McKinney has shown that he would have issued the misconduct ticket regardless of Mease's protected conduct, the undersigned concludes that a genuine issue of material fact remains.   In an affidavit, McKinney attests that he issued the misconduct ticket solely based on Mease's violation of prison rules, and that he was unaware of Mease's protected conduct until after he submitted the misconduct ticket.   (ECF No. 75-6, PageID.472-473). McKinney's affidavit "do[es] little more than deny the allegations put forth by" Mease, "which is insufficient to meet his burden."  *See Maben*, 887 F.3d at 268 (quoting *Blatter*, 175 F.3d at 399).

In sum, the undersigned finds that there are genuine issues of material fact bearing on whether Mease's oral and written grievances were frivolous, whether Mease's grievances were made prior to CO McKinney issuing the excessive noise

misconduct ticket, and whether McKinney would have issued the misconduct ticket regardless of Mease's grievances.  The undersigned therefore recommends that the Court deny summary judgment as to Mease's Claim Four.

### e.  Claim Five

Mease next alleges that during the misconduct review for the June 29, 2019, Class III excessive noise misconduct ticket, he asked URF staff for two grievance forms.  (ECF No. 1, PageID.6.)  Mease alleges that Defendant Wech responded by giving him four grievance forms and telling Mease to "get the name right."  CO Wech then went on to tell Mease "we're a team, your ass is out of here."  Mease says that on July 5, 2019, Wech conducted the misconduct hearing on the excessive noise misconduct ticket, finding Mease guilty and issuing maximum sanctions (five days in top-lock) in order to retaliate against Mease.  (*Id.*)  These sanctions ultimately contributed to Mease losing his prison job.  (*Id.*, PageID.92.)

Defendants aver that this claim fails because Wech could have issued additional sanctions but chose not to, and because Wech was "simply doing [his] job." (ECF No. 75, PageID.34.)  In their reply brief, Defendants go on to argue that this claim represents Mease's attempt to "turn one claim into multiple" by naming both the individual who issued the misconduct ticket and the individual who issued the misconduct sanctions.  (ECF No. 96, PageID.573.)

Defendants' arguments appear to sound in quasi-judicial immunity.  True, courts have determined that hearing officers for Class I (major) misconduct tickets are entitled to absolute immunity from liability with respect to their judicial acts.

*Shelly v. Johnson*, 849 F.2d 228, 229-230 (6th Cir. 1988) (per curiam); *see also Reynolds-Bey v. Harris*, 428 F. App'x 493, 498 (6th Cir. 2011).  That is because hearing officers for Class I misconduct tickets are "professional hearing officers in the nature of administrative law judges."  *Shelly v. Johnson*, 684 F. Supp. 941, 943 (W.D. Mich. 1987).  But Defendants do not offer any authority suggesting that hearing officers for Class II or III (minor) misconduct tickets are entitled to the same.  As such, the fact that Wech was "doing his job" as a hearing officer for a Class III misconduct ticket does not bar Mease's claim.  *See Reed-Bey v. Lewis*, No. 13-10168, 2017 WL 4296599, at *2 (E.D. Mich. Sept. 28, 2017) (finding that the defendant was not entitled to absolutely immunity for her actions as a hearing officer because she "was not an independent attorney and was subordinate to the warden"); *Good v. Heyns*, No. CV 15-12064, 2017 WL 3446262, at *4 (E.D. Mich. May 25, 2017) (same), *R. & R. adopted*, No. 15-12064, 2017 WL 3434084 (E.D. Mich. Aug. 10, 2017).

Ultimately, it is the undersigned's opinion that finding a prisoner guilty of a minor misconduct and imposing excessive sanctions[14] based on a prisoner's exercise of protected conduct, as opposed to their violation of prison rules, sounds in First Amendment retaliation.  *Cf. Young v. Mulvaine*, No. 22-3733, 2023 WL 5665755, at *5 (6th Cir. June 23, 2023) (finding that there were genuine issues of material fact bearing on whether the grievance process was available to plaintiff to exhaust, among others, a claim of retaliatory sanctions); *Jarrett v. Greene*, No. 1:22-CV-456, 2022 WL

---

[14]    Defendants argue that Wech did not in fact issue Mease the "maximum sanctions."  (ECF No. 75, PageID.34.)  Regardless, Mease alleges that the sanctions were unwarranted, and that they were issued in an attempt to retaliate against him.

13795466, at *7 (S.D. Ohio Oct. 24, 2022) (finding that the plaintiff plausibly alleged that the defendants took an adverse action against him by issuing excessive sanctions following a rule infraction), *R. & R. adopted*, No. 1:22-CV-456, 2022 WL 17253595 (S.D. Ohio Nov. 28, 2022).  Considering the alleged statements of CO Wech during Mease's misconduct review, there are genuine issues of material fact bearing on whether Wech found Mease guilty of the excessive noise misconduct and sanctioned him with five days of top-lock in retaliation for Mease's past protected conduct.

Accordingly, the undersigned recommends that the Court deny Defendants' motion for summary judgment as to Claim Five.

### f.  Claim Six

Mease finally alleges that on July 7, 2019, CO McKinney conducted a misconduct hearing for a Class III profanity misconduct issued by another CO.  (ECF No. 1, PageID.6.)  Mease avers that McKinney found him guilty of the misconduct ticket and issued him the maximum sanctions (five days in top-lock) in order to retaliate against him for his protected conduct.  (*Id.*)  This occurred just one week after Mease says that COs Lemmerman and McKinney mocked him for "crying" about Lemmerman and McKinney to the administrative staff.  (*Id.*, PageID.5.)

Defendants make the same arguments with respect to Claim Six as they did Claim Five; they argue that there were additional sanctions available to McKinney and that that McKinney was simply doing his job.  (ECF No. 75, PageID.442-444; ECF No. 96, PageID.572-574.)  Because there are genuine issues of material fact bearing on whether McKinney found Mease guilty of the profanity misconduct ticket

and sanctioned him with five days of top-lock in retaliation for Mease's past protected conduct, the undersigned recommends that the Court deny Defendants' motion for summary judgment as to Claim Six.

## VI.    Qualified and Sovereign Immunity

In addition to arguing that they did not violate Mease's rights under the First Amendment, Defendants asserts that they are entitled to qualified immunity in their personal capacities and sovereign immunity in their official capacities.  (ECF No. 75, PageID.444-447.)

Defendants' claim for qualified immunity is largely redundant.  After initially arguing that they are entitled to judgment because they did not violate Mease's First Amendment rights, they argue that they are entitled to qualified immunity because they did not violate Mease's First Amendment rights.[15]  Because it is the undersigned's opinion that there are genuine issues of material fact bearing on whether Defendants violated Mease's clearly established First Amendment rights, it is also the undersigned's opinion that Defendants are not entitled to qualified immunity.  *See Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) ("Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which

---

[15]    In other words, Defendants do not argue that the rights at issue were not clearly established.

39

a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).

Defendants' claim for sovereign immunity is different.  Defendants argue that they are entitled to sovereign immunity in their official capacities as to Mease's claims for monetary damages regardless of the merits of Mease's claims.

A lawsuit against a state official for monetary damages is treated as a lawsuit against the State.  *Brandon v. Holt*, 469 U.S. 464, 471 (1985).  The states and their departments are immune under the Eleventh Amendment from suit in the federal courts unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993).  Section 1983 did not expressly abrogate Eleventh Amendment immunity, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court, *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).  As such, it is the undersigned's opinion that Mease's claims against Defendants in their official capacity for monetary damages are properly dismissed in accordance with the Eleventh Amendment.

## VII.  Recommendation

The undersigned respectfully recommends that Defendants are entitled to sovereign immunity in their official capacities with respect to Mease's claims for monetary damages, but that Defendants are not entitled to qualified immunity in

40

their personal capacities.  The undersigned further recommends that the Court grant Defendants' motion for summary judgment with respect to the following:

- Mease's Claim One as it pertains to Defendants Lemmerman and McKinney, and as it pertains to Mease's allegations that Defendant Wonnacott retaliated by confiscating Mease's property and terminating his employment; and

- Mease's Claim Two.

And the undersigned respectfully recommends that the Court deny Defendants' motion for summary judgment with respect to the following:

- Mease's Claim One as it pertains to Mease's allegation that Defendant Wonnacott retaliated by depriving Mease of his religious services;

- Mease's Claim Three;

- Mease's Claim Four;

- Mease's Claim Five; and

- Mease's Claim Six.

If the Court accepts this recommendation, the following claims will remain against Defendants in their personal capacities: (1) Mease's claim that Defendant Wonnacott retaliated against Mease for refusing to break his fast by depriving him of his religious services beginning May 24, 2019; (2) Mease's claim that Defendants Lemmerman and McKinney retaliated against him by refusing to sign off on his itinerary on June 29, 2019; (3) Mease's claim that Defendant McKinney issued Mease a retaliatory misconduct ticket on June 29, 2019; (4) Mease's claim that Defendant

Wech issued him retaliatory misconduct sanctions on July 5, 2019; and (5) Mease's claim that Defendant McKinney issued him retaliatory misconduct sanctions on July 7, 2019.

Dated:   October 23, 2023                              /s/ *Maarten Vermaat*
                                                        MAARTEN VERMAAT
                                                        U. S. MAGISTRATE JUDGE

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).